## LAUNDRY OWNERS MUTUAL LIABILITY INSURANCE ASSOCIATION, Petitioner

### v.

## BUREAU OF WORKERS' COMPENSATION (UPMC Presbyterian and Smolter), Respondents.

Commonwealth Court of Pennsylvania.

Argued May 5, 2004.

Decided July 14, 2004.

Charles S. Katz, Jr., Philadelphia, for petitioner.

Edward R. Ehrhardt, Jr., Pittsburgh, for intervenor.

BEFORE: COLINS, President Judge, and LEADBETTER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Senior Judge JIULIANTE.

Laundry Owners Mutual Liability Insurance Association (Insurer) petitions for review of the July 31, 2003 order of the Bureau of Workers' Compensation Fee Review Hearing Office (FRHO) that granted two fee review applications on behalf of UPMC Presbyterian (Provider) and awarded Provider payment of $60,795.04 with interest for a remaining unpaid charge for medical services rendered to Nelson Smolter (Claimant) for the period of March 17 through April 2, 2001, in accordance with the provisions of Section 306(f.1)(10) of the Workers' Compensation Act (Act).[1] We affirm in part, reverse in part and remand for a recalculation of the amount of Provider's fee to be paid by Insurer.

The FRHO's Hearing Officer found the following facts. On March 12, 2001,

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 531(10).

Claimant sustained multiple injuries in a head-on motor vehicle accident and was admitted to Provider's facility via the emergency department. Also on March 12, 2001, Claimant underwent multiple surgical procedures to repair his injuries, which included multiple fractures of the arms, legs and hip. On March 14 and 16, 2001, Claimant underwent similar surgical procedures. Finally, on March 21, 2001, Claimant underwent a limb salvage operation described as a "flap procedure." Following the flap procedure, Claimant received post-operative care until his transfer on April 2, 2001.

Provider billed Insurer for the services rendered to Claimant during the period of March 12 through April 2, 2001 using a required health insurance claim. Provider's claim reported a total charge of $229,686.75 and indicated Provider's status as a Level I trauma center. Provider also submitted an itemized billing statement in support of its total charge.

In response, Insurer through its repricer, advised Provider via an Inpatient Explanation of Benefits (IEOB), dated June 4, 2001, that Provider's bill was payable at 100% of the allowable charge for the dates of March 12 through 16, 2001 and that a total charge of $159,040.50 was identified for those five days. A second IEOB, also dated June 4, 2001, separately identified a total charge amount of $70,646.25 for the period of March 17 through April 2, 2001 and indicated a "total Act 44 amount"[2] of $9,851.21. Insurer also issued a June 5, 2001 IEOB summarizing the amounts mentioned.

Provider subsequently submitted two fee review applications to the Fee Review Section of the Bureau of Workers' Compensation (Bureau). In Application No. 11971, Provider sought review of the time-liness of payment by Insurer for Provider's bill for service provided to Claimant from March 12 through April 2, 2001. In Application No. 12739, Provider sought review of both the amount and timeliness of payment regarding the same bill.

On August 6, 2001, the Bureau issued administrative decisions granting Provider additional payment of $60,795.04 and interest thereon with regard to the bill submitted. Insurer timely filed a request for a fee review hearing with the FRHO. With regard to both of Provider's applications, Insurer asserted that after the first five days, Provider was not providing acute care to a patient with an immediately life-threatening or urgent injury as required by Section 306(f.1)(10) of the Act. Thus, Insurer maintained that the amount it paid was appropriate.

An FRHO hearing was held on August 28, 2002 at which both parties presented evidence. Insurer presented the testimony of Dean Meixner, a claims adjuster, and introduced the deposition testimony of Dr. John Nolan, a board-certified orthopedic surgeon who reviewed the 400–page record in the case.

Provider presented the testimony of Dr. Robert Goitz, an attending orthopedic surgeon in the case, and Dr. Gary Gruen, a board-certified plastic surgeon who is on the Board of Directors of the Pennsylvania Trauma Systems Foundation. Although not involved in Claimant's care, Dr. Gruen also reviewed the extensive case record.

Dr. Goitz opined that Claimant was suffering from a life-threatening condition until March 28, 2001, at which time he was ready for discharge to a rehabilitation facility. The doctor, however, noted in Claimant's discharge summary report that

---

**2.** In 1993, former Governor Tom Ridge signed into law the Act of July 2, 1993, P.L. 90 (commonly known as Act 44), which amended the Act by imposing medical fee caps on certain medical services associated with work-related injuries and diseases.

Claimant's discharge was delayed due to insurance reasons. The Hearing Officer found Dr. Goitz's testimony to be credible and accepted it as fact.

Dr. Gruen also testified that Claimant had a life and limb threatening condition and was not an appropriate candidate for transfer until March 28, 2001. The doctor further testified that as of March 28, 2001, Claimant was stable for discharge and did not need acute care guidelines. The Hearing Officer also found Dr. Gruen's testimony to be credible and accepted it as fact.

Dr. Nolan, Insurer's medical witness, testified that Claimant's injuries were immediately life threatening or urgent up until March 19, 2001, when Claimant's flap procedure was delayed because he was bumped by another patient needing surgery. However, Dr. Nolan did not feel that Claimant could be transferred to another facility until March 28, 2001. Noting Dr. Nolan's lack of specialized training and experience with extremity injuries and microsurgery, the Hearing Officer found Dr. Nolan's testimony not credible to the extent it conflicted with that of Drs. Goitz and Gruen.

Meixner, a claims adjuster for Insurer since 1991, stated that in determining the appropriate level of reimbursement in this case, his primary focus in reviewing the records was to ascertain the period of time that Claimant's treatment represented life-threatening and urgent care. Meixner determined that Claimant's condition became non-life-threatening after the first five days of admission. Noting Meixner's lack of any medical degree or substantial medical education in trauma matters, the Hearing Officer found Meixner's testimony not

credible to the extent that it conflicted with that of Drs. Goitz and Gruen.

Turning to the Act, the Hearing Officer initially noted generally that pursuant to Section 306(f.1)(3)(i) of the Act, 77 P.S. § 531(3)(i), a health care provider shall not accept payment for treatment or service rendered in excess of 113% of the applicable Medicare reimbursement rate for said treatment or services. The Hearing Officer then cited Section 306(f.1)(10) of the Act, which provides for payment of the usual and customary charge if acute care is provided to a patient with an immediately life-threatening or urgent injury by a Level I or Level II trauma center accredited by the Pennsylvania Trauma Systems Foundation.

The Hearing Officer next cited Section 109 of the Act, 77 P.S. § 29, which provides that the term *life-threatening injury* "shall be defined by the American College of Surgeons' [ACS'] triage guidelines regarding use of trauma centers for the region where the services are provided."[3] The Hearing Officer further noted that acute care is defined by Section 127.3 of the Workers' Compensation Medical Cost Containment Regulations (WC–MCC Regulations) as "[t]he inpatient and outpatient hospital services provided by a facility licensed by the Department of Health as a general or tertiary care hospital, other than a specialty hospital, such as rehabilitation and psychiatric provider." 34 Pa. Code § 127.3.

In her decision, the Hearing Officer also referred to the language of Section 127.128(c) of the WC–MCC Regulations, which provides:

> upon in determining whether a claimant's injury is urgent or life threatening for purposes of payment pursuant to the provisions of Section 306(f.1)(10) of the Act." Hearing Officer's Decision at 16; R.R. 970 (emphasis added).

---

**3.** In her decision, the Hearing Officer stated: "As outlined and officially noticed in the Findings of Fact, [the ACS'] triage guidelines regarding the use of trauma centers for the region where the services are provided *are the statutorily defined criteria which must be relied*

If the patient is *initially transported* to the trauma center or burn facility in accordance with the [ACS'] triage guidelines, payment for transportation to the trauma center or burn facility, and payments for the full course of acute care services by all trauma center or burn facility personnel, and all individuals authorized to provide patient care in the trauma center or burn facility, shall be at the provider's usual and customary charge for the treatment and services rendered.

34 Pa.Code § 127.128(c) (emphasis added).

In applying Section 306(f.1)(10) and the WC–MCC Regulations to the evidence, the Hearing Officer determined that on March 12, 2001, Claimant had sustained an urgent and/or life-threatening injury according to the ACS' triage standards. The Hearing Officer further determined that Provider, a Level I trauma center, rendered continuous inpatient care during the period of March 12 through April 2, 2001 and that said care was related to Claimant's life-threatening and/or urgent injuries.

As a result, the Hearing Officer granted Provider's fee review applications and determined that Provider was entitled to payment at its usual and customary rate for the care rendered to Claimant from March 12 through April 2, 2001. Noting that the parties had stipulated that Insurer had made payment at 100% of Provider's actual charge for the first five days, the Hearing Officer awarded Provider payment from Insurer in the amount of $60,795.04 plus accrued interest for the remaining unpaid charge amount for the care rendered to Claimant following March 17, 2001.

Insurer's petition for review to this Court followed.[4] The essence of Insurer's appeal is that Section 306(f.1)(10) does not require that a health care provider must be paid 100% of its usual and customary charge where the care provided is no longer acute or if the claimant is no longer suffering from a life-threatening or urgent injury. In short, Insurer contends that Section 306(f.1)(10) is *not* a "once immediately life-threatening or urgent, always immediately life-threatening or urgent" statute.

### I.

■ Insurer's first argument is that Section 127.128(c) of the WC–MCC Regulations impermissibly expands the definition of "immediately life threatening or urgent injury" for which a provider can be paid at its usual and customary rate, which is inconsistent with Section 306(f.1)(10) of the Act. In support of its position, Insurer points out that Section 306(f.1)(10) was enacted as part of the legislation passed as Act 44. Insurer maintains that the legislative purpose in enacting Act 44 was to contain the escalating medical costs associated with work-related injuries and illnesses. *See Acme Mkts., Inc. v. Workers' Compensation Appeal Board (Johnson and Peterson M.D.)*, 725 A.2d 863 (Pa. Cmwlth.1999).

Insurer asserts that the following three primary conditions must be met in order for a provider to be paid its usual and customary charge under Section 306(f.1)(10): (1) the care provided must be acute care, (2) in an acute care facility and (3) the patient must be suffering from an immediately life-threatening or urgent injury. Section 306(f.1)(10) provides:

4. Our review of a Commonwealth agency's decision is limited to determining whether constitutional rights were violated, whether an error of law was committed, whether a practice or procedure of the agency was not followed and whether the findings of fact are supported by substantial evidence in the record. 2 Pa.C.S. § 704; *Gunter v. Workers' Compensation Appeal Board (City of Philadelphia)*, 573 Pa. 386, 825 A.2d 1236 (2003).

*If acute care is provided in an acute care facility to a patient with an immediately life threatening or urgent injury by a Level I or Level II trauma center* accredited by the Pennsylvania Trauma Systems Foundation under the [Act of July 3, 1985, P.L. 164, *as amended,* 35 P.S. § 6921–6938] known as the "Emergency Medical Services Act," or to a burn injury patient by a burn facility which meets all the service standards of the American Burn Association, or if basic or advanced life support services, as defined and licensed under the "Emergency Medical Services Act," are provided, *the amount of payment shall be the usual and customary charge.*

77 P.S. § 531(10) (emphasis added).

Specifically, Insurer maintains that 34 Pa.Code § 127.128(c) is contrary to the cost reduction goals of Act 44 insomuch as it requires only that the patient be "initially transported" to the trauma center in accordance with the ACS' triage guidelines in order for payment for the full course of care at the provider's usual and customary charge. Insurer argues that by requiring only that the patient be initially transported to the trauma center in a life-threatening condition in order for the acute care facility to receive payment at its usual and customary charge for all services provided, the Bureau misconstrued Section 306(f.1)(10) as being a "once immediately life-threatening or urgent, always immediately life-threatening or urgent" statute. Therefore, Insurer contends that 34 Pa. Code § 127.128(c) must be declared invalid.

For essentially the same reason, Insurer contends that the definition of "acute care" in 34 Pa.Code § 127.3, *i.e.,* "[t]he inpatient and outpatient hospital services provided by a facility licensed by the Department of Health as a general or tertiary care hospital, other than a specialty hospital, such as

rehabilitation and psychiatric provider," is contrary to the legislative intent in enacting Section 306(f.1)(10). Therefore, Insurer also contends that 34 Pa.Code § 127.3 must be declared invalid and that the term "acute care" should be given its common dictionary meaning. In view of its position, Insurer asserts that 34 Pa.Code §§ 127.3 and 127.128(c) must be declared contrary to the legislative intent of Act 44 and, therefore, invalid.

In response, Provider contends that although the purpose of Act 44 was to lower medical costs in workers' compensation cases, the Act was, in fact, compromise legislation that preserved some areas in which payment was retained at the pre-existent usual and customary rate. Provider further contends that the legislative purpose in enacting Section 306(f.1)(10) was to create such an exception for services provided by acute care facilities, *i.e.,* Level I and II trauma centers.

Further, Provider maintains that the language of 34 Pa.Code § 127.128 does not expand the scope of payment as contemplated by Section 306(f.1)(10). Section 127.128 of the WC–MCC Regulations provides:

(a) Acute care provided in a trauma center or burn facility is exempt from the medical fee caps, and shall be based on 100% of usual and customary charges if the following apply:

(1) The patient has an immediately life-threatening injury or urgent injury.

(2) Services are provided in an acute care facility that is one of the following:

(i) A level I or level II trauma center....

....

(c) If the patient is initially transported to the trauma center or burn facility in accordance with the [ACS'] triage guidelines, payment for transportation to the trauma center or burn facility, and payments for the full course of acute care

services by all trauma center or burn facility personnel, and all individuals authorized to provide patient care in the trauma center or burn facility, shall be at the provider's usual and customary charge for the treatment and services rendered.

34 Pa.Code §§ 127.128(a) and (c).

■■■ In a case involving the interpretation of a legislative act, the interpretation of the statute given to it by the agency charged with administering it "must be given great weight and should not be disregarded unless clearly erroneous." *Mistick Constr. v. Dep't of Labor and Indus., Prevailing Wage Appeals Bd.*, 764 A.2d 95, 97 (Pa.Cmwlth.2000). "Where the statutory scheme is complex, the reviewing court must be even more cautious in substituting its discretion for the expertise of an administrative agency." *Graduate Health Sys., Inc. v. Pennsylvania Ins. Dep't,* 674 A.2d 367, 370 (Pa.Cmwlth.1996).

In the present case, it is undisputed that at the time Claimant was transported to Provider's facility, his injuries were *immediately life-threatening or urgent.* It is also undisputed that Provider's facility, a Level I trauma center, is an "acute care" facility for purposes of Section 306(f.1)(10). As such, we do not believe that the Bureau misinterpreted Section 306(f.1)(10) in drafting Section 127.128(c) of the MCC Regulations, which provides that once a claimant is initially transported to a qualifying acute care facility in accordance with ACS' guidelines, that facility is entitled to 100% of its usual and customary charges for the services it provided.

Nothing in Section 306(f.1)(10) requires that a claimant be subject to multiple re-evaluations while being treated at an acute care facility in order to determine if his condition is no longer immediately life-threatening or urgent. Therefore, the Bureau's omission of such a requirement is not inconsistent with Section 306(f.1)(10).

We also believe that the definition of acute care in 34 Pa.Code § 127.3 is not contrary to the legislative purpose in enacting Section 306(f.1)(10). We agree with Provider that Section 306(f.1)(10) was intended by the legislature to be a specific *exception* to the general fee cap provisions and that, therefore, Section 306(f.1)(10) requires that qualifying acute care facilities receive their usual and customary charges for services provided to workers' compensation claimants.

We further believe that if the legislature had intended to define the term "acute care" as Insurer claims, it would have done so. However, it did not. Consequently, we conclude that the definition of acute care in 34 Pa.Code § 127.3 is *not inconsistent* with the purpose in enacting Section 306(f.1)(10), a specific *exception* to the general fee cap requirements in Act 44.

In view of the foregoing, we conclude that 34 Pa.Code §§ 127.3 and 127.128(c) are not contrary to the legislative purpose in enacting Section 306(f.1)(10) of the Act. Thus, we conclude that the Bureau's regulations are valid.

## II.

Insurer advances several other arguments in support of its position that Section 306(f.1)(10) is not a "once immediately life-threatening or urgent, always immediately life-threatening or urgent" statute.[5]

---

5. Insurer again argues that to continue to pay a provider for "acute care" medical services at its usual and customary rate where the claimant's injuries are no longer immediately life-threatening or urgent violates the plain language of Section 306(f.1)(10) and is contrary to Act 44's purpose. Inasmuch as we believe that this issue has been adequately addressed in our previous discussion, we will not revisit it. We note that Insurer has not

Insurer contends that the ACS' triage guidelines were never intended to be used to evaluate a patient's condition following the initial evaluation when the decision to take the patient to the trauma center is made. Insurer, however, concedes that Section 109 of the Act provides that the terms "life-threatening injury" and "urgent injury" shall be defined by the [ACS'] triage guidelines regarding use of trauma centers for the region where the services are provided." 77 P.S. § 29.

■ We believe that the legislature's reliance on the ACS' triage guidelines in defining the terms "life-threatening injury" and "urgent injury," clearly indicates that the status of the claimant's injury is to be determined as "life-threatening" or "urgent" based upon an initial evaluation. We do not interpret the language of either Section 109 or 306(f.1)(10) as requiring multiple re-evaluations of the claimant's condition for purposes of determining whether the claimant remains in an immediately life-threatening or urgent condition at all times while undergoing treatment in a qualifying acute care facility. "Where a statute provides internal definitions, the meanings of the terms provided are controlling." *School Dist. of the City of Erie v. Pennsylvania Labor Relations Bd.,* 832 A.2d 562, 567 (Pa.Cmwlth.2003).

Insurer further contends that insomuch as the cost containment provisions of Act 44 are modeled after the cost containment provisions in the federal Medicare program, the Court should look for guidance on emergency care cost limitations to Subchapter XVIII of the Social Security Act (commonly known as the Medicare Act), 42 U.S.C. §§ 1395—1395ccc. In particular, Insurer cites the definition of terms in the Medicare Act added by the Omnibus Budget Reconciliation Act of 1981 (OBRA 1981), *see* 42 U.S.C. § 1395(x), and the

Emergency Medical Treatment and Active Labor Act (EMTALA), *see* 42 U.S.C. § 1395dd. Insurer concedes, however, that although OBRA 1981 (like Act 44) defines "bona fide emergency services," it does not define when a bona fide emergency ceases.

Nonetheless, in support of its position, Insurer cites the EMTALA, which requires hospitals to treat patients with emergency medical conditions until that condition stabilizes before transferring the individual to another facility. Pursuant to EMTALA, if an individual comes to a hospital with an "emergency medical condition," the facility must provide such treatment as may be required "to stabilize" the individual's medical condition before the individual can be transferred. *See* 42 U.S.C. § 1395dd(b)(1).

EMTALA defines both "emergency medical condition" and "to stabilize." "Emergency medical condition" is defined in relevant part as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part....

42 U.S.C. § 1395dd(e)(1)(A). "To stabilize" is defined as follows:

[W]ith respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure,

cited any specific legislative history regarding

Section 306(f.1)(10) in support of its position.

within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . .

42 U.S.C. § 1395dd(e)(3)(A).

Insurer maintains that incorporating the term "to stabilize" as used in the EMTALA into Section 306(f.1)(10) will completely satisfy the legislature's purpose in reducing costs in workers' compensation cases. Insurer contends that once the patient's condition has stabilized and is no longer immediately life-threatening, the provider should no longer be entitled to payment of its usual and customary charge. Insurer asserts that the FRHO should determine the date of stabilization.

In response, Provider contends that the EMTALA is an "anti-dumping" statute that is specifically limited to the transfer of patients with emergency medical conditions and is therefore irrelevant to this case. Provider further maintains that the EMTALA existed at the time Act 44 was considered and passed, but was not used as a model for any provision of Act 44.

This Court believes that Insurer's reliance on the EMTALA is misplaced. To reiterate, if the legislature had wanted to include in Act 44 provisions similar to those in the EMTALA, it would have done so. Our review of Section 306(f.1) of the Act, 77 P.S. § 531, indicates that it did not. It is well settled that "this Court may not insert any words to a statute where the [l]egislature has failed to so provide." *Philadelphia Gas Works v. Commonwealth,* 741 A.2d 841, 846 (Pa.Cmwlth. 1999). *See also Kashuba v. Workers' Compensation Appeal Board (Hickox Constr.),* 713 A.2d 169 (Pa.Cmwlth.1998) (reviewing court will not supply an omission in a statute even if it appears that the legislature failed to contemplate a certain case or situation). Consequently, we reject Insurer's contention that the legisla-

tive intent in enacting Act 44 would be satisfied by requiring the FRHO to make a determination as to when a patient's condition in an acute care facility has "stabilized" for purposes of applying fee caps to services provided by such facilities.

■■■■ Moreover, in order to ascertain legislative intent, all sections of a statute must be read together. *Shire v. Workers' Compensation Appeal Board (Gen.Motors),* 828 A.2d 441 (Pa.Cmwlth.), *appeal denied,* 577 Pa. 675, 842 A.2d 408 (2003). Where a conflict exists between parts of a statute, the specific provisions prevail over the general ones. *Id.* As we have stated above on several occasions, Section 306(f.1)(10) is a *specific* exception to the *general* fee cap provisions in Act 44.

### III.

■■■■ Insurer also contends that the FHRO erred in awarding Provider its usual and customary charge where Provider's medical witnesses, even if accepted as credible, only establish that Claimant's condition was immediately life-threatening or urgent until March 27, 2001. Further, Insurer further asserts that this Court should find, based upon the testimony of its medical expert, Dr. Nolan, that Provider is only entitled to payment at its usual and customary charge through March 19, 2001.

Insurer argues that the testimony of Drs. Goitz and Gruen, that Claimant's condition was immediately life-threatening or urgent until March 28, 2001 because Claimant was at risk for infection, blood clot or an elevated temperature until that date, should have been rejected. Insurer maintains that these were merely potential risks that were not indicative of an immediately life-threatening or urgent condition. Essentially, Insurer maintains that this Court should re-examine the Hearing Officer's determinations regarding credi-

bility and evidentiary weight. It is well settled that matters of credibility and evidentiary weight in workers' compensation matter are within the sole discretion of the fact finder. *Rissi v. Workers' Compensation Appeal Board (Tony DePaul & Son)*, 808 A.2d 274 (Pa.Cmwlth.2002), *appeal denied*, 573 Pa. 687, 823 A.2d 146 (2003). Hence, we will not reweigh the evidence or substitute our credibility determinations for those of the Hearing Officer. *Id.*

In the present case, however, Provider concedes in its brief that as of March 28, 2001, the medical records confirmed that discharge planning was completed and that Claimant was cleared to be transferred as of March 29, 2001. *See* Provider's (Intervenor's) Brief at 35. Provider further concedes that on March 29, 2001, substantial efforts were made to discharge Claimant to a rehabilitation-type hospital or skilled nursing facility. *Id.* These facilities, however, were unable to accept Claimant due in part to the unavailability of beds. *Id.* Provider also contends that its ability to transfer Claimant was hindered by unwillingness on the part of Meixner, Insurer's claims adjuster, to issue a pre-certification to the potential receiving facility.

In Finding of Fact No. 8, the Hearing Officer noted that Dr. Goitz confirmed that Claimant's transfer was delayed because of insurance reasons. In Claimant's Discharge Summary Report, Dr. Goitz stated: "[Claimant's] transfer was delayed for insurance reasons. His final disposition will be the Transitional Care Unit here at Montefiore University Hospital. His discharge medications are as previously dictated. ..." Hearing Office Exhibit No. 14, p. 80; R.R. 240.

In Finding of Fact No. 10, the Hearing Officer stated:

(f) [Meixner] acknowledged that [Provider] had placed a call to him on March 29th concerning [Claimant] and this was the first time he was contacted by [Provider] concerning [Claimant]. He was not able to return the call until March 30, 2001 and when he returned the call he was advised that [Claimant] was ready for transfer that day and that they were calling for authorization for transfer to a skilled nursing facility, North Hills Manor Care.

(g) On March 29th [Meixner] had received a call from North Hills Manor Care. A message was left for him to return their call and [Meixner] testified that it was indicated therein that North Hills was seeking authorization of a guaranteed payment of whatever their rate was at the time of the service. He further testified that he told Manor Care that Insurer could only make payments according to the workers' comp fee schedule and advised that he would look into whether or not the Manor Care daily rate for room and board ($217.00) fell within the fee schedule or exceeded it. In his initial phone call, he advised that he didn't see a problem with transferring the patient to the facility although when told that Manor Care was looking for a guarantee of payment he advised that he couldn't guarantee anything because it was a workers' compensation matter. He told Manor Care that he would get back to them. The gentleman he spoke with at Manor Care later called him back, indicating that the administrator wouldn't take a patient based upon their earlier conversation with regard to reimbursement. This is how [Meixner] left the matter with North Hills Manor Care on March 30, 2001.

Hearing Officer's Decision at 11; R.R. 965.

Upon a review of the Hearing Officer's decision, which we find to be supported by the record, it appears that all parties were aware that Claimant was cleared to be discharged to another facility as early as

March 29, 2001. Provider's medical witnesses, Drs. Goitz and Gruen, do not dispute this fact.

Nevertheless, Claimant was unable to be discharged on March 29, 2001 either because North Hills Manor Care, the potential receiving facility contacted by Provider, lacked available space or because it would not accept Claimant without a guarantee from Insurer that North Hills would receive its full rate. Even though Insurer could not guarantee North Hills that it would receive its payment at its full rate for treating Claimant, this Court does not believe that Insurer should have to pay Provider its usual and customary charge for services provided to Claimant after he was cleared for discharge to a non-acute care facility.

Therefore, we must conclude that inasmuch as the record indicates that Provider acknowledged that Claimant was cleared for discharge on March 29, 2001, Insurer should not have to pay Provider its usual and customary charge for the period of time after Claimant was cleared for discharge to a transitional care facility. We emphasize that this determination is based on Provider's own medical evidence, which undisputedly reflects that Claimant was ready to be discharged on March 29, 2001.

In other words, we do not believe that our result in this matter invalidates either the Bureau's definition of acute care found at 34 Pa.Code. § 127.3 or imposes any undue limits on the acute services exempt from the Act 44 fee cap as described in 34 Pa.Code § 127.128(c). Moreover, we also note that we are not imposing any requirement that an immediate determination must be made as to when a claimant's condition has "stabilized" in order to indicate that his condition is no longer "immediately life-threatening or urgent" for imposing the Act 44 fee caps prior to the time he has been cleared for discharge from an acute care facility.

Rather, we are simply recognizing that in the case *sub judice*, Claimant was cleared for discharge from Provider's acute care facility on March 29, 2001. Although Claimant was not transferred until April 2, 2001, he only remained at Provider's facility until that time because his discharge was delayed for reasons unrelated to any need for continued acute care services.

In view of the foregoing, we reverse the order of the FRHO to the extent it awarded Provider its usual and customary charge for services rendered to Claimant for the period of March 29 through April 2, 2001 and remand for a recalculation of the amount of Provider's fee consistent with this opinion. In all other respects, the order of the FRHO is affirmed.

## *ORDER*

AND NOW, this 14th day of July, 2004, the July 31, 2003 order of the Bureau of Workers' Compensation's Fee Review Hearing Office is hereby: (1) REVERSED to the extent it awarded UPMC Presbyterian its usual and customary charge for services rendered to Claimant Nelson Smolter for the period of March 29 through April 2, 2001 and (2) REMANDED for a recalculation of the amount of UPMC Presbyterian's fee consistent with the foregoing opinion. In all other respects, the order of the Board is AFFIRMED.