# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Geisinger Health System and    :
Geisinger Clinic,                :
           Petitioners     :
                        :
         v.           :  No. 1627 C.D. 2015
                        :  Submitted: January 22, 2016
Bureau of Workers' Compensation  :
Fee Review Hearing Office (SWIF),  :
           Respondent    :

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge[1]

OPINION BY
SENIOR JUDGE PELLEGRINI         FILED: April 21, 2016

Geisinger Health System and Geisinger Clinic (collectively, Provider) petition for review of an order of the Medical Fee Hearing Officer (Hearing Officer) determining that the State Workers' Insurance Fund (Insurer) appropriately reimbursed Provider for treatment and services rendered to Randall Campbell (Claimant) from May 5 through May 7, 2014. The Hearing Officer awarded Provider reimbursement for its treatment and services rendered in its trauma center in the amount of 100% of its usual and customary charges determined by reference to a database repricing Provider's charges in accord with other providers' charges for similar treatment and services provided in the same

---

[1] This opinion was reassigned to the authoring judge on February 29, 2016.

geographic area. Provider contends it is entitled to reimbursement of its actual charges without reference to any repricing database which is used to recalculate its rates based on charges for similar treatment in the geographic region. For the reasons that follow, we affirm.

**I.**

The Hearing Officer found the following facts which are not in dispute. On May 5, 2014, Claimant sustained a work injury when a 2x4 board he was using as a lever broke and lodged near his left orbit. An ambulance transported Claimant to Provider with the board still in place. Claimant stabilized the board with his hands. Provider called a trauma alert. On arrival at Provider's emergency department, Claimant's physical exam revealed a large 2x4 board at a 30 degree angle in the superior aspect of the left orbit but not into the globe. Upon removal of the board, a 1.5 centimeter splinter remained in the superiolateral sclera. This needed to be addressed by ophthalmology. A CT scan of the head, cervical spine, and facial bones revealed skin lacerations, subcutaneous soft tissue contusions, and hematoma in the left cheek and periorbital regions. On May 6, 2014, Provider discharged Claimant in stable condition with instructions to return the next day for repair of his left eyelid. Claimant returned the next day for eyelid reconstruction and was discharged in good condition following a successful procedure without complications. There is no dispute that the treatment was at a Level 1 trauma center for life threatening or urgent injuries.

Provider then submitted HCFA-1500 (claim) forms to Insurer seeking payment for its physicians' treatment of Claimant. Provider's claim forms

2

included itemized billing charges for treatment rendered to Claimant from May 5 through May 7, 2014. Provider sought full payment for services rendered in a Level I trauma center at its usual and customary charges, i.e. its actual charges, without reference to how other trauma centers in the geographic region reimbursed charges for similar treatment.

Insurer responded with an explanation of benefits (EOB) which recognized that Provider rendered inpatient services at a Level I or II trauma center to a patient with immediately life threatening or urgent injuries. Insurer's EOB further stated: "As such 'usual, customary and reasonable rates for this geographic area have been utilized as the reimbursement methodology.'" (F.F. No. 3) (citation omitted.)

Provider then filed applications for fee review under Section 306(f.1) of the Workers' Compensation Act (Act)[2] seeking reimbursement based on its actual charges. In August 2014, the Medical Fee Review Section circulated administrative decisions concluding that Insurer owed Provider an additional amount for Claimant's treatment. The Medical Fee Review Section noted that Provider's documentation met the guidelines in Section 127.128 of the Workers' Compensation Medical Cost Containment (MCC) Regulations and determined Provider was to be reimbursed at 100% of the billed charges.

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §531.

Insurer filed a timely request for a hearing. At the hearing, Insurer submitted the deposition testimony of Linda A. Lengle (Repricing Manager), a repricing manager for Hoover Rehabilitation Services. The Hearing Officer found the Repricing Manager's testimony credible in its entirety. The Repricing Manager testified as to her specific familiarity with the Act and the MCC Regulations and stated that to determine the appropriate amount of reimbursement, she uses a "usual and customary database." In trauma cases, rather than applying the workers' compensation fee schedule, she applies the usual and customary information at the 85th percentile. The Repricing Manager further testified that the "usual and customary data" is obtained from "FAIR Health." In explaining the definition of "usual and customary charge," she stated:

> In 2011, a Statement of Purpose of Adoption of Usual and Customary Charge Reference was posted on the Pennsylvania Labor and Industry [Department] website where they [sic] said that; effective 11/1/2010, when resolving applications for Fee Review, under 34 [Pa. Code §]127.256, the Department will utilize the 85th percentile of the MDR [market data retrieval] database, published by Ingenix to determine the usual and customary charge, as defined in 34 [Pa. Code §]127.3.

(Lengle Dep. at 11; R.R. at 15a.)

The Hearing Officer reversed the Medical Fee Review Section's determination, noting that Section 127.3 of the MCC Regulations defines "actual charge" as: "The provider's usual and customary charge for a specific treatment, accommodation, product or service." 34 Pa. Code §127.3. By comparison, "usual and customary charge" is defined as: "The charge most often made by providers

4

of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided." *Id*. The Hearing Officer found Insurer's payment to Provider shall be based on "100% of the usual and customary charge" as defined in 34 Pa. Code §127.3 rather than 100% of Provider's "actual charge." *Id*. The Hearing Officer then determined that Insurer properly reimbursed Provider at 100% of the usual and customary charge for services in that geographic region for the services rendered to Claimant.

In further explaining her decision, the Hearing Officer reasoned:

Although Provider is correct that Section 127.128(c) of the [MCC Regulations] references "the provider's usual and customary charge," Section 127.128(a) and (b) of the [MCC Regulations] and Section 306(f.1)(10) of the Act clearly indicate that services rendered in a trauma center shall be paid at the usual and customary rate, not at the provider's usual and customary charge or at the provider's actual charge. The fact that the "usual and customary charge" is cited three times as opposed to the single citation of "the provider's usual and customary charge", as well as the fact that the [MCC Regulations] include a specific definition for "actual charge" and a separate definition for "usual and customary charge," leads the undersigned to conclude that the aim of both the [MCC Regulations] and the Act was to ensure that providers would properly be reimbursed at 100% of the usual and customary charge for the specific treatment rendered in the geographic location where that specific treatment was provided. Indeed, the purpose of the [MCC Regulations] is to prevent providers from charging excessive fees for treatment and services rendered to workers' compensation claimants.

5

(Hearing Officer's Op., Conclusion of Law No. 8.) (emphasis added.)

Citing the Repricing Manager's testimony, the Hearing Officer further reasoned:

> Repricing Manager testified on behalf of Insurer that the [Department] specified in its "Statement of Purpose of Adoption of Usual and Customary Charge Reference" that the Department would utilize the 85th percentile of the MDR database to determine the usual and customary charge as defined in Section 127.3 of the [MCC Regulations]. It is therefore consistent and logical to reason that payment for services and treatment at a trauma center would be paid at the theoretically lesser amount of 100% of the usual and customary charges as opposed to 100% of the actual charges.

*Id.* (emphasis added.)

Accordingly, the Hearing Officer entered an order granting Insurer's fee review contest and holding that Insurer appropriately reimbursed Provider for the treatment and services rendered to Claimant and that no additional payment was due. Provider petitions for review.[3]

---

[3] Our review is limited to determining whether the Hearing Officer's findings are supported by substantial evidence and whether the Hearing Officer erred as a matter of law or violated Employer's constitutional rights. *Roman Catholic Diocese of Allentown v. Bureau of Workers' Comp., Fee Review Hearing Office (Lehigh Valley Health Network)*, 33 A.3d 691 (Pa. Cmwlth. 2011), *appeal denied*, 53 A.3d 759 (Pa. 2012).

## II.

## A.

Provider contends that it is entitled to be reimbursed for the charges for transport and the full course of acute care at its usual and customary charges, not on a calculation based on other providers' charges for similar treatment and services provided in the same geographic area. Provider cites Section 306(f.1)(10) of the Act, which provides:

> If acute care is provided in an acute care facility to a patient with an immediately life threatening or urgent injury by a Level I or Level II trauma center accredited by the Pennsylvania Trauma Systems Foundation under the act of July 3 1985 (P.L. 164, No. 35), known as the "Emergency Medical Services Act," or to a burn injury patient by a burn facility which meets all the service standards of the American Burn Association, or if basic or advance life support services, as defined and licensed under the "Emergency Medical Services Act," are provided, the amount of payment shall be the usual and customary charge.

77 P.S. §531(10) (emphasis added.)

Provider also cites Section 127.128(c) and (d) of the MCC Regulations, which it argues the Hearing Officer impermissibly disregarded. Sections 127.128(c) and (d) provide:

> (c) If the patient is initially transported to the trauma center or burn facility in accordance with the American College of Surgeons (ACS) triage guidelines, payment for transportation to the trauma center or burn facility, and payments for the full course of acute care services by

7

all trauma center or burn facility personnel, and all individuals authorized to provide patient care in the trauma center or burn facility, shall be at the <u>provider's usual and customary charge</u> for the treatment and services rendered.

(d) The determination of whether a patient's initial and presenting condition meets the definition of a life-threatening or urgent injury shall be based upon the information available at the time of the initial assessment of the patient. A decision by ambulance personnel that an injury is life threatening or urgent shall be presumptive of the reasonableness and necessity of the transport to a trauma center or burn facility, unless there is clear evidence of violation of the ACS triage guidelines.

34 Pa. Code §§127.128(c), (d) (emphasis added.)

Applying Sections 127.128(c) and (d) here, Provider asserts that Insurer concedes that inpatient services were provided by a Level I or Level II trauma center to a patient with an immediately life threatening or urgent injury. (Hearing Officer Op., F.F. No. 3.) Further, Insurer made no attempt to submit evidence of a violation of the ACS triage guidelines. Consequently, Provider asserts that Insurer failed to overcome the presumption of reasonableness and necessity specified in 34 Pa. Code §127.128(d). As such, Provider argues Insurer is not permitted to reduce Provider's usual and customary charge using any method, including a usual and customary charge *database*.

### B.

The trauma center exception in Section 306(f.1)(10) of the Act states that acute care provided in a trauma or burn center to injured workers with life

8

threatening or urgent injuries is reimbursable at "the usual and customary charge." 77 P.S. §531(10). The issue in this case concerns the definition of "usual and customary charge" within the meaning of that provision.

The term "usual and customary charge" appears several places in the Act and its regulations. Notably, such language is used in Section 306(f.1)(3)(i) of the Act and its regulations governing reimbursement under the medical fee caps, which is calculated under the Medicare program. Section 306(f.1)(3)(i) provides, in pertinent part:

> If the prevailing charge, fee schedule, recommended fee, inflation index charge, DRG [diagnosis-related group] payment or any other reimbursement has not been calculated under the Medicare program for a particular treatment, accommodation, product or service, the amount of the payment may not exceed eighty percentum of the charge most often made by providers of similar training, licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided.

77 P.S. §531(3)(i) (emphasis added.)

Similarly, Section 102 of the MCC Regulations (relating to medical fee caps – usual and customary charge) provides:

> If a Medicare payment mechanism does not exist for a particular treatment, accommodation, product or services, the amount of payment made to a health care provider shall be either 80% of the usual and customary charge for that treatment, accommodation, product or service in the

9

> geographic area where rendered, or the actual charge, whichever is lower.

34 Pa. Code §102 (emphasis added.)

However, the language in Section 306(f.1)(10) of the Act does not limit the provider's charges to the usual and customary charges for similar treatment or services in the geographic area where the treatment or services were rendered. Further, unlike the language in the fee cap provisions, Section 127.128(c) of the MCC Regulations interprets Section 306(f.1)(10) of the Act as authorizing a trauma center or burn facility to be reimbursed at the "provider's usual and customary charge for the treatment and services rendered" where the patient presents with immediately life threatening or urgent injuries. 34 Pa. Code §127.128(c). This language is identical to the MCC Regulations' definition of "actual charge" which states: "The provider's usual charge and customary charge for a specific treatment, accommodation, product or service." 34 Pa. Code §127.3.

Based on the absence of "similar treatment or services in the geographic area where the treatment or services were rendered" language in Section 306(f.1)(10) of the Act and its implementing regulations regarding what a "usual and customary charge" is, when the other provisions contain such language, Provider contends that the General Assembly intended that it should be reimbursed for its actual charges in rendering trauma treatment.

Fortunately the term "usual and customary charge" has been defined in the Act. Section 109 of the Act, one of the general definitional sections

10

contained in the Act, provides "words and phrases when used in this [workers' compensation] act shall have the meanings given to them in this section unless the context clearly indicates otherwise" and provides the following definition:

> "Usual and customary charge" means the charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided.

77 P.S. §29.

The implementing regulation, as it must, contains an identical definition. Section 127.3 of the MCC Regulations defines this term as "the charge most often made by providers of similar training, experience and licensure for specific treatment … or service in the geographic area where the treatment … or service is provided." 34 Pa. Code §127.3.

The question then becomes whether, just because the General Assembly and those implementing the regulations chose to repeat the definition within other provisions but not in Section 306(f.1)(10), providers were to receive actual charges, notwithstanding how that term is defined in the Act. In determining whether a defined term has a meaning that differs from the definition given to it, we must take into consideration the "context" and language that "surrounds" the term. *Pennsylvania Associated Builders and Contractors, Inc. v. Department of General Services*, 932 A.2d 1271, 1279 (Pa. 2007). In this case, there is nothing in the context of the language surrounding the term to indicate that

11

the statutory definition of "usual and customary charges" means that a provider should receive its actual charges.[4]  If that were the case, the General Assembly would have drafted the pertinent part of Section 306(f.1)(10) to read "a provider's customary and usual charge" rather than "*the* usual and customary charge."[5]

We recognize that despite the language of the fee cap provisions, Section 127.128(c) of the MCC Regulations interprets Section 306(f.1)(10) of the Act as containing just that language.  By doing so, it equates "usual and customary charges" with its definition of "actual charge" which states:  "The provider's usual charge and customary charge for a specific treatment, accommodation, product or service."  34 Pa. Code §127.3 (emphasis added).  While 34 Pa. Code §127.128(c) would indicate that reimbursement would be at the usual rate *if contained in the*

---

[4] The Repricing Manager testified that the "usual and customary data" is obtained from "FAIR Health."  Then she went on to state that the Department will utilize the 85th percentile of the market data retrieval database, published by Ingenix.  She did not testify "who" or "what" was Fair Health, how it was related to the Ingenix database, whether the database was accepted within the industry, or whether the database was for the usual and customary charge for the relevant geographic region for other trauma centers.  However, Provider did not challenge the use of this database in repricing its charges seeking instead its actual charges.  Because the use of this database was not challenged, we will accept their use in this case but do not in any way address its general applicability or validity.

[5] Provider also contends that in *Roman Catholic Diocese of Allentown v. Bureau of Workers' Comp., Fee Review Hearing Office (Lehigh Valley Health Network)*, 33 A.3d 691 (Pa. Cmwlth. 2011), *appeal denied*, 53 A.3d 759 (Pa. 2012), we held that once it is admitted that a claimant was treated for an immediately life threatening or urgent injury and received acute care in a Level I or Level II trauma center, Provider should be entitled to payment of 100% of "provider's usual and customary charges" or "actual charges" for the treatment rendered to Claimant in accord with Section 127.128(c) and (d) of the MCC Regulations.  However, in that case, what was at issue was whether the injury was life threatening and therefore whether the provider was entitled to usual and customary charges, not how that term should be defined.

12

*statute*, a regulation that is at variance with a statute is ineffective to change the statute's meaning. That is so because "the power of an administrative agency to prescribe rules and regulations under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by the statute." *Volunteer Firemen's Relief Association of the City of Reading v. Minehart*, 227 A.2d 632, 635-36 (Pa. 1967). "When an agency adopts regulations at variance with the statute, the regulations, and not the statute, fall by the wayside." *Union Electric Corporation v. Board of Property Assessment, Appeals and Review of Allegheny County*, 721 A.2d 823 (Pa. Cmwlth. 1998), *rev'd on other grounds*, 721 A.2d 823 (Pa. 1999); *see also Roxborough Manayunk Federal Savings and Loan Association v. Commonwealth*, 687 A.2d 1202 (Pa. Cmwlth. 1997); *Xerox Corporation v. City of Pittsburgh*, 327 A.2d 206 (Pa. Cmwlth. 1974).[6]

**III.**

The rules of statutory construction apply to administrative regulations. *Bayada Nurses, Inc. v. Department of Labor and Industry*, 958 A.2d 1050 (Pa. Cmwlth. 2008), *aff'd*, 8 A.3d 866 (Pa. 2010). A defined term is to be applied

---

[6] Provider relies on *Laundry Owners Mutual Liability Insurance Association v. Bureau of Workers' Compensation (UPMC)*, 853 A.2d 1130 (Pa. Cmwlth. 2004), where we reasoned that Sections 127.3 and 127.128 of the MCC Regulations are not contrary to the legislative purpose of Section 306(f.1)(10) of the Act in being an exception to the Act's medical fee caps imposed by the cost containment provisions in Section 306(f.1)(3)(i) of the Act, 77 P.S. §531(3)(i). Therefore, Section 127.128(c) requires reimbursement at "provider's usual and customary charge." 34 Pa. Code §127.128(c) (emphasis added). In that case, the insurer argued that Section 127.128(c) impermissibly expanded the definition of "immediately life threatening or urgent injury" by expanding the definition of "acute care" for which a provider can be paid at its usual and customary rate. Unlike here, because that term was not defined, we held that it was not at variance with the Act.

unless a different meaning can be ascribed to the word or phrase because of its context.  Because there is nothing in the language of Section 306(f.1)(10) of the Act that indicates that "usual and customary charge" is other than how it is defined in Section 109 of the Act as a "charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided," we affirm the Hearing Officer's order.


_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Geisinger Health System and :
Geisinger Clinic, :
           Petitioners :
            :
           v. : No. 1627 C.D. 2015
            :
Bureau of Workers' Compensation :
Fee Review Hearing Office (SWIF), :
           Respondent :

# **O R D E R**

AND NOW, this 21st day of April, 2016, the order of the Bureau of Workers' Compensation Fee Review Hearing Officer in the above-referenced case is affirmed.

_____
DAN PELLEGRINI, Senior Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Geisinger Health System and :
Geisinger Clinic, :
                Petitioners :
                                 :
         v. : No. 1627 C.D. 2015
                                 : Submitted: January 22, 2016
Bureau of Workers' Compensation :
Fee Review Hearing Office (SWIF), :
                Respondent :

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE DAN PELLEGRINI, Senior Judge

**CONCURRING OPINION**
**BY JUDGE SIMPSON**              **FILED: April 21, 2016**

        This case deals with the cost containment provisions for care of injured workers, as applied in the exceptional instance of trauma care, when urgency limits a provider's ability to contain costs. There is a specific statutory provision which deals with this issue, Section 306(f.1)(10) of the Pennsylvania Workers' Compensation Act (Act).[1]

        I agree with the Majority that in Section 306(f.1)(10) of the Act, the General Assembly wanted to define, and strictly limit, the type of provider which could receive more favorable repricing. I also agree with the Majority[2] that the

---

[1] Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §531(10).

[2] See Maj. Slip Op. at 12, n.4 (noting there is no testimony whether a "database was for the usual and customary charge for the relevant geographic region for other trauma centers.").

General Assembly wanted to define, and strictly limit, the type of provider whose charges would be used in a "usual and customary charge" evaluation.

Thus, where trauma care is involved, the provider's charges are not compared to those of every "Emergicare," "Redicare," or "Urgent Care" facility; rather, the trauma care provider's charges are compared only to other "Level I or Level II trauma center[s] accredited by the Pennsylvania Trauma Systems Foundation under the [A]ct of July 3, 1985, P.L. 164 … known as the 'Emergency Medical Services Act.'" Section 306(f.1)(10) of the Act, 77 P.S. §531(10).

According to the general statutory definition in the Act of the phrase "usual and customary charge," a comparison is made to charges most often made by providers of, among other things, similar *licensure* in the geographic area where the service is provided. Section 109 of the Act, 77 P.S. §29. Thus, based on the statutory definition of the term "usual and customary charge," two more points are apparent: the special provision for trauma care defines the licensure required; and, the appropriately licensed facilities for comparison must be in the same geographic area as where the service at issue was rendered.

However, there is no evidence in this case that another accredited trauma care facility even exists in the geographic area of the provider here. No other such provider is identified in any way. Similarly, there is no evidence in this case of the charge of any accredited trauma care facility anywhere for any service, much less in the same geographic area as where the service was rendered here.

The only charges by an accredited trauma care facility in this case are the charges by the provider.

As for the use of a "usual and customary database" for repricing, this was mentioned briefly in a short deposition from a repricing manager. Maj. Slip. Op. at 3-5; Deposition of Linda A. Lengle, 3/17/15 (Lengle Dep.), at 10-11, 13-14, Reproduced Record (R.R.) at 14a-15a, 17a-18a.

Unfortunately, the repricing manager did not create the database; rather, some other entity created and maintains the database. So, there is no testimony about how this database was developed, what it contains, or whether data are organized by geographic areas. Specifically, there is no testimony whether the unidentified "data" used by the repricing manager were limited to charges by accredited trauma care facilities in the same geographic region. In fact, there is no testimony that charges by accredited trauma care facilities are even included in the database. Worse, based on the "Bureau's statement" referenced in the repricing manager's testimony, Lengle Dep. at 14, R.R. at 18a, there is every indication that the database was never intended to be used for trauma care repricing.[3] For these reasons, I doubt the database applies to repricing trauma care.

---

[3] *At its end* the Bureau's Statement appears to *exclude* such care. In its entirety, the Statement provides (with emphasis added):

> Since their original promulgation in November 1995, the [Department's] medical cost containment regulations have provided fee caps for medical treatment under the [Act], as amended. These regulations contain a number of different provisions to address the different types of billing conducted by various types of medical providers.

**(Footnote continued on next page…)**

Generally, the regulations establish rates of reimbursement based upon the Medicare's system's rates. However, Medicare does not establish a rate for all services that providers could conceivably utilize.

In recognition of this fact, since their inception, the regulations state: 'If a Medicare payment mechanism does not exist for a particular treatment, accommodation, product or services, the amount of the payment made to a health care provider shall be either 80 percent of the usual and customary charge for that treatment, accommodation, product or services in the geographic region where rendered, or the actual charge, whichever is lower.' 34 Pa. Code §127.102.

Specifically, with respect to outpatient care, the regulations provide: 'If a Medicare allowance does not exist for a reported HCPCS code, or successor codes, the provider shall be paid either 80 percent of the usual and customary charge, or the actual charge, whichever is lower.' 34 Pa. Code 127.103(c).

However, until recently, the [Department] did not have access to a reference that would assist in determining what constitutes 'the usual and customary charge' for such services. Thus, pursuant to the recommendations of representatives of the medical provider and insurer communities, on Sept. 18, 2010, the [Department] published the following notice in the Pennsylvania Bulletin:
Effective 11/01/10 when resolving applications for fee review under 34 Pa. Code §127.256, the [Department] will utilize the 85th percentile of the MDR database published by FAIR Health to determine 'the usual and customary charge' as defined in 34 Pa. Code §127.3.

Importantly, the database referenced by the [D]epartment contains only codes for medical procedures that lack a Medicare rate or fee, as established in the [D]epartment's 1995 regulations. Thus the database does not affect Part A Chargemaster services (i.e., those fees charged by 'cost-based' providers, including hospitals, burn centers, etc.).

**(Footnote continued on next page…)**

While the provider here generally objected to the use of any method of reducing its charges, including a database,[4] it did not raise objections to the content of the database in a manner which would have alerted the Fee Review Hearing Officer to make more complete findings in this area. Therefore, I agree with the result reached by the Majority. However, I caution that going forward an insurer seeking to reprice trauma care may need much more of a foundation to support the use of a database.

_____
ROBERT SIMPSON, Judge

_____

**(continued…)**

See  www.portal.state.pa.us/portal/server.pt?open=514&objID=779137&mode=2  (2016). Thus, based on this Statement, the database appears to apply to only Part B (medical) expenses, such as outpatient expenses, rather than Part A (hospital) expenses at issue here.

I recognize the general rule that only items which are part of the certified record are considered on appeal. Kochan v. Dep't of Transp., Bureau of Driver Licensing, 768 A.2d 1186 (Pa. Cmwlth. 2001). Although the record does not include the Bureau's Statement, neither party contests the Statement's contents or the fact that the repricing manager followed its instructions in determining Provider's reimbursement. See Lengle Dep., 3/17/15 at 11, 14; R.R. at 15a, 18a. Therefore, I discern no harm in referring to Statement, which is readily accessible on the Department's internet website at the above address.

[4] The provider argued, "The Insurer is not permitted to reduce the *provider's* usual and customary charge using any other method, including a database." Petitioner's Am. Br. at 13.