# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Allegheny General Hospital, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1945 C.D. 2015 |
| | : | Submitted: April 8, 2016 |
| Bureau of Workers' Compensation | : | |
| Fee Review Hearing Office | : | |
| (State Workers' Insurance Fund), | : | |
| Respondent | : | |

BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION**
**BY JUDGE SIMPSON**           **FILED: July 6, 2016**

        This case deals with the cost containment provisions for care of injured workers, as applied in the exceptional instance of trauma care, when urgency limits a provider's ability to contain costs. There is a specific statutory provision which deals with this issue, Section 306(f.1)(10) of the Pennsylvania Workers' Compensation Act (Act).[1] The question here is to what extent an outside database can be used to reprice (reduce) reimbursement for trauma care.

---

[1] Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §531(10). This subsection provides:

> If acute care is provided in an acute care facility to a patient with an immediately life threatening or urgent injury by a Level I or Level II trauma center accredited by the Pennsylvania Trauma Systems Foundation under the act of July 3 1985 (P.L. 164, No. 35), known as the 'Emergency Medical Services Act,' or to a burn injury patient by a burn facility which meets all the service standards of the American Burn Association, or if basic or advance life support services, as defined and licensed under the 'Emergency

**(Footnote continued on next page…)**

In particular, Allegheny General Hospital (Provider) petitions for review of an order of Medical Fee Hearing Officer Colleen Pickens (Hearing Officer) that determined the State Workers' Insurance Fund (Insurer) appropriately reimbursed Provider at a repriced level for trauma care rendered to William Galena (Claimant) from October 8 through October 16, 2014. Provider asserts Hearing Officer erred in overruling a relevance objection to testimony from Insurer's repricing manager, Linda A. Lengle (Repricing Manager) regarding use of a database to determine the "usual and customary charge" for trauma care.

Based on our recent decision in <u>Geisinger Health System and Geisinger Clinic v. Bureau of Workers' Compensation Fee Review Hearing Office</u>, ___ A.3d ___ (Pa. Cmwlth., No. 1627 C.D. 2015, filed April 21, 2016), 2016 WL 1592957, we conclude the testimony of Repricing Manager did not provide substantial evidence to support the use of a database or overcome the relevance objection. Accordingly, we reverse and remand for further proceedings.

## I. Background

Hearing Officer found the following facts. On October 8, 2014, Claimant, a plumber, sustained a serious work injury when a trench he was in gave way. <u>See</u> Hearing Officer's Op., 9/16/15, Finding of Fact (F.F.) No. 9a. Claimant

---

**(continued…)**

> Medical Services Act,' are provided, <u>the amount of payment shall be the usual and customary charge</u>.

77 P.S. §531(10) (emphasis added).

was crushed under 200 to 300 pounds of dirt.  Id.  Fortunately, Claimant's head escaped injury.  Id.  An air ambulance transported Claimant to Provider's trauma bay.  Id.

Upon arrival at Provider's trauma center, Claimant complained of bilateral chest wall pain and bilateral hip pain.  F.F. No. 9b.  Based on imaging studies, Provider determined Claimant suffered a right clavicle fracture, a right scapula body fracture, a right hemothorax, bilateral rib fractures, bilateral pelvic fractures, and extra peritoneal hemorrhage.  Id.  Provider then admitted Claimant to its trauma ICU.  Id.

The next day, Claimant underwent the following procedures: percutaneous fixation of the posterior pelvic ring fracture dislocation with accompanying left-sided zone two sacral fracture, closed treatment of the pelvic ring fracture without manipulation, and application of an anterior pelvic external fixator.  F.F. No. 9c.  Five days later, Claimant underwent open treatment of the right clavicular fracture with internal fixation and closed treatment of the right scapular facture.  F.F. No. 9d.  On October 16, 2014, Provider discharged Claimant to a skilled nursing facility.  F.F. No. 9e.

Thereafter, Provider submitted a UB-04 claim form to Insurer showing itemized billing charges of $120,948 for treatment rendered to Claimant during the period of October 8-16, 2014.  F.F. No. 2.  Provider sought payment in full for services rendered in an accredited trauma center.  Id.

On October 28, 2014, Insurer issued an explanation of benefits (EOB). F.F. No. 3. Insurer's EOB acknowledged Provider's inpatient services were provided by a Level I trauma center to a patient with an immediately life threatening or urgent injury. Id. As such, Insurer utilized the "usual, customary and reasonable rates for this geographic area" as the reimbursement methodology. Id. Insurer's EOB further indicated the inpatient allowance is based on a case rate established for a specific diagnosis related group (DRG). Id. The DRG rate is based on usual, customary and reasonable rates for the geographic area. Id. Ultimately, Insurer repriced Provider's bill and paid $88,106.32. Id.

In response to the EOB, Provider filed an application for fee review pursuant to Section 306(f.1) of the Act. F.F. No. 4. Provider requested the application for both the amount and the timeliness of the payment. F.F. No. 4.

In January 2015, the Medical Fee Review Section circulated an administrative determination which concluded Insurer owed Provider an additional payment in the amount of $34,861.68 for treatment rendered to Claimant during the period of October 8-16, 2014. F.F. No. 5. The Fee Review Section reasoned the documentation submitted by Provider met the guidelines in Section 127.128 of the Workers' Compensation Medical Cost Containment (MCC) Regulations and determined "Provider is entitled to be reimbursed at 100% of the billed charges." Id. The Fee Review Section also concluded Insurer submitted payment to Provider in a timely manner. Id.

Insurer filed a timely request for a hearing to contest the fee review determination. F.F. No. 6. At the hearing, Insurer submitted Repricing Manager's deposition. F.F. No. 7. Employed by Hoover Rehabilitation Services since 1993 as a medical bill review manager, Repricing Manager testified as to her specific familiarity with the Act and the MCC Regulations. Dep. of Linda A. Lengle, 3/17/15 (Lengle Dep.) at 9; Reproduced Record (R.R.) at 9a.

Repricing Manager conceded that the Bureau of Workers' Compensation's (Bureau) Statement of Purpose of Adoption of Usual and Customary Charge Reference (Statement of Purpose) relates to Section 127.103 of the MCC Regulations, 34 Pa. Code §127.103 (relating to <u>outpatient</u> providers subject to the Medicare fee schedule). F.F. No. 10c. Repricing Manager further conceded the Statement of Purpose does <u>not</u> relate to either Section 127.128 of the MCC Regulations, 34 Pa. Code §127.128 (relating to trauma centers and burn facilities—exemption from fee caps) or payment for treatment that meets the trauma guidelines. <u>Id.</u> In particular, Hearing Officer found (with emphasis added):

> [Repricing Manager] acknowledged that the [Bureau's] Medical Fee Review Section, the same agency that issued the Statement of Purpose, ordered that payment be made to Provider at 100% of Provider's usual and customary charge, and therefore does not agree with her interpretation of the Statement of Purpose. I find that her acknowledgment of these issues is correct and that her testimony related to these matters is credible. However, <u>I find that the dispute in the instant matter is not over the Section of the [MCC] Regulations to which this Statement of Purpose applies, but rather whether Provider is due reimbursement for acute care rendered to Claimant at 100% of Provider's actual charge or at 100% of the usual and customary charge.</u>

5

F.F. No. 10c. In explaining her position, Hearing Officer continued:

d. Section 127.3 of the [MCC] Regulations sets forth the definition of 'actual charge' and the definition of 'usual customary charge.' The 'actual charge' is defined as 'the provider's usual and customary charge for a specific treatment, accommodation, product or service.' In contrast, the 'usual and customary charge' is defined as the 'the charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided.' I therefore find as fact that payment to Provider shall be based upon 100% of the usual and customary charge rather than 100% of Provider's actual charge.

e. Because Provider is due reimbursement at 100% of the usual and customary charge, it stands to reason that a reliable source is needed to determine what the usual and customary charge shall be. Through the [Statement of Purpose], the [Bureau's] Medical Fee Review Section has established that 'the department will utilize the 85th percentile of the MDR [medical data retrieval] database published by FAIR Health to determine the 'usual and customary charge' as defined in 34 Pa. Code §127.3. Based upon the Medical Fee Review Section's utilization of the 85th percentile of the MDR database published by FAIR Health, I find as a fact that this database is a reliable and accurate source that shall be used to determine reimbursement rates at the usual and customary charge.

f. Based upon [Repricing Manager's] credible testimony that the MDR database published by FAIR Health was indeed used in the instant matter to determine the amount of payment due to Provider, I specifically find as a fact that Insurer properly reimbursed Provider in the amount of $88,106.32 for the treatment rendered to Claimant from October 8, 2014 through October 16, 2014.

6

F.F. Nos. 10d, e, f.

In her Conclusions of Law, Hearing Officer noted Provider's position that the Act and MCC regulations "warrant payment of 100% of the provider's usual and customary charge, and not payment of a usual and customary charge 'determined through the application of any formula that takes into account what other providers may charge.'" Conclusion of Law (C.L.) No. 7. In dismissing Provider's argument, and allowing use of a database to reprice costs for trauma care, Hearing Officer reasoned (with emphasis added):

> Although Provider is correct that Section 127.128(c) of the [MCC] Regulations references 'the provider's usual and customary charge", Section 127.128 (a) and (b) of the [MCC] Regulations and Section 306(f.1)(10) of the Act clearly indicate that services rendered in a trauma center shall be paid at the usual and customary rate, not at the provider's usual and customary charge or at the provider's actual charge. The fact that the 'usual and customary charge' is cited three times as opposed to the single citation of 'the provider's usual and customary charge', as well as the fact that the [MCC] Regulations include a specific definition for 'actual charge' and a separate definition for 'usual and customary charge,' leads the undersigned to conclude that the aim of both the [MCC] Regulations and the Act was to ensure that providers would properly be reimbursed at 100% of the usual and customary charge for the specific treatment rendered in the geographic location where that specific treatment was provided. Indeed, the purpose of the [MCC Regulations] is to prevent providers from charging excessive fees for treatment and services rendered to workers' compensation claimants. Furthermore, [Repricing Manager] testified on behalf of Insurer that the … Medical Fee Review Section specified in its [Statement of Purpose] that the Department would utilize the 85th percentile of the MDR database to determine the usual and customary charge as defined in Section 127.3 of the [MCC] Regulations. It is therefore consistent and

7

logical to reason that payment for treatment and services rendered in a trauma center would be paid at the theoretically lesser amount of 100% of the usual and customary charges as opposed to 100% of the actual charges. The precedents of [Roman Catholic Diocese of Allentown v. Bureau of Workers' Compensation, Fee Review Hearing Office (Lehigh Valley Health Network), 33 A.3d 691 (Pa. Cmwlth. 2011)]; and [Laundry Owners Mutual Liability Insurance Association v. Bureau of Workers' Compensation (UPMC), 853 A.2d 1130 (Pa. Cmwlth. 2004)] support this conclusion by indicating that 'payment for such services [services rendered in a trauma center] must be at the usual and customary rate.'

C.L. No. 8.

Accordingly, Hearing Officer granted Insurer's fee review request and held Insurer properly reimbursed Provider at a reduced rate for the acute care treatment and services it rendered Claimant. Provider petitions for review.[2]

## II. Discussion

### A. Argument

#### 1. Bureau's Statement of Purpose

Provider first contends Hearing Officer erred in overruling its objection to Repricing Manager's testimony regarding the Bureau's Statement of Purpose because such testimony was irrelevant. Provider asserts Insurer's sole purpose in presenting Repricing Manager's testimony was to establish Insurer

---

[2] Our review is limited to determining whether Hearing Officer's findings are supported by substantial evidence and whether Hearing Officer erred as a matter of law or violated Employer's constitutional rights. Roman Catholic Diocese of Allentown v. Bureau of Workers' Comp., Fee Review Hearing Office (Lehigh Valley Health Network), 33 A.3d 691 (Pa. Cmwlth. 2011).

8

properly repriced and paid Provider's charges. However, Repricing Manager justified Insurer's repricing by reference to the Bureau's Statement of Purpose, which Insurer never submitted into evidence.

The Statement of Purpose, Provider maintains, addresses a determination of the proper payment amount under Section 306(f.1)(3)(i) of the Act, 77 P.S. §531(3)(i), and 34 Pa. Code §127.102, which relate to the usual and customary charge for the medical fee caps. Section 306(f.1)(3)(i) provides in pertinent part:

> For purposes of this clause, a provider shall not require, request or accept payment for the treatment, accommodations, products or services in excess of one hundred thirteen percentum of the prevailing charge at the seventy-fifth percentile … or one hundred thirteen percentum of any other Medicare reimbursement mechanism, as determined by the Medicare carrier or intermediary, whichever pertains to the specialty service involved, determined to be applicable in this Commonwealth under the Medicare program for comparable services rendered. If the commissioner determines that an allowance for a particular provider group or service under the Medicare program is not reasonable, it may adopt, by regulation, a new allowance. If the prevailing charge, fee schedule, recommended fee, inflation index charge, DRG payment or any other reimbursement has not been calculated under the Medicare program for a particular treatment, accommodation, product or service, <u>the amount of the payment may not exceed eighty percentum of the charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided</u>.

9

77 P.S. §531(3)(i) (emphasis added).

Similarly, Section 127.102 of the MCC Regulations provides (with emphasis added):

> If a Medicare payment mechanism does not exist for a particular treatment, accommodation, product or services, the amount of payment made to a health care provider shall be either 80% of the usual and customary charge for that treatment, accommodation, product or service in the geographic area where rendered, or the actual charge, whichever is lower.

34 Pa. Code §127.102.

Provider asserts the actual payment amount under this formula is 113% of the Medicare rate in effect in 1995, adjusted yearly by the percentage to which the average weekly wage increased. As such, Provider argues, Section 127.102 of the MCC Regulations imposes a fee cap. The Statement of Purpose explains how to calculate a payment amount under Section 127.102.

To the contrary, the trauma exception in Section 306(f.1)(10) of the Act, and its regulatory provision, 34 Pa. Code §127.128,[3] make no mention of

---

[3] Section 127.128 of the MCC regulations, 34 Pa. Code §127.128, provides, in pertinent part (with emphasis added):

> (a) Acute care provided in a trauma center or a burn facility is exempt from the medical fee caps, and shall be paid based on 100% of usual and customary charges if the following apply:
>
> (1) The patient has an immediately life-threatening injury or urgent injury.

**(Footnote continued on next page…)**

10

determining the usual and customary charge by reference to what other providers charge. Rather, Section 306(f.1)(10) of the Act provides (with emphasis added):

> If acute care is provided in an acute care facility to a patient with an immediately life threatening or urgent injury by a Level I or Level II trauma center accredited

---

**(continued…)**

> (2) Services are provided in an acute care facility that is one of the following:
>
> (i) A level I or level II trauma center, accredited by the Pennsylvania Trauma Systems Foundation ….
>
> ….
>
> (b) Basic or advanced life support services, as defined and licensed under the Emergency Medical Services Act, provided in the transport of patients to trauma centers or burn facilities under subsection (a) are also exempt from the medical fee caps, and shall be paid based on 100% of usual and customary charges.
>
> (c) If the patient is initially transported to the trauma center or burn facility in accordance with the American College of Surgeons (ACS) triage guidelines, payment for transportation to the trauma center or burn facility, and payments for the full course of acute care services by all trauma center or burn facility personnel, and all individuals authorized to provide patient care in the trauma center or burn facility, shall be at the provider's usual and customary charge for the treatment and services rendered.
>
> ….
>
> (g) The medical fee cap exemptions may not continue to apply for payments for acute care treatment and services for life-threatening or urgent injuries following a transfer from a trauma center or burn facility to any other provider.

34 Pa. Code §§127.128 (a)-(e), (g) (citation omitted).

11

> by the Pennsylvania Trauma Systems Foundation under the act of July 3 1985 (P.L. 164, No. 35), known as the 'Emergency Medical Services Act,' or to a burn injury patient by a burn facility which meets all the service standards of the American Burn Association, or if basic or advance life support services, as defined and licensed under the 'Emergency Medical Services Act,' are provided, the amount of payment shall be the usual and customary charge.

77 P.S. §531(10).

Citing the Latin legal maxim and well-recognized statutory construction principle *expressio unius est exclusio alterius* (the express mention of one thing in a statute implies the exclusion of other things), Provider argues if the General Assembly intended that payment for services under the trauma care exception be based on 80% of the charges made by similar trauma care providers in the same geographic area, it would have included such language in Section 306(f.1)(10) of the Act and 34 Pa. Code §127.128. However, because the legislature excluded any reference to other trauma care providers or their charges, the Bureau properly interpreted these provisions as exempting trauma care providers from the Act's fee cap provisions.

Consequently, Provider argues, the Statement of Purpose relied on by Repricing Manager is wholly irrelevant to a determination of the proper payment amount under Section 127.128 of the MCC Regulations, relating to the exemption from fee caps for trauma centers and burn facilities. As such, Provider asserts Hearing Officer erred in concluding otherwise.

12

Summarizing, Provider argues evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa. R.E. 401. Here, the amount Insurer must pay Provider for the acute trauma care it provided to Claimant was the fact Hearing Officer needed to determine. Because the Statement of Purpose, and Repricing Manager's testimony regarding it, have no application to payment for charges exempt from the fee caps, Hearing Officer erred in admitting such evidence. In short, Repricing Manager's testimony regarding the proper construction of a regulation imposing a fee cap was irrelevant to the proper construction of a different regulation exempting acute trauma care from the fee cap provisions. Therefore, Provider urges, because this evidence constituted the entirety of Insurer's evidence, Hearing Officer's decision based on that evidence must be reversed.

## 2. Reimbursement

Consequently, Provider contends Hearing Officer erred in determining Insurer met its burden of proving it properly reimbursed Provider for its trauma care services rendered. As discussed above, Provider asserts Hearing Officer misconstrued 34 Pa. Code §127.128 as essentially permitting a payment limitation or fee cap. To that end, Hearing Officer imposed a fee cap determined by Repricing Manager's use of the 85th percentile of the market data retrieval database (MDR) published by Fair Health. F.F. No. 10e, f; C.L. No. 8; Lengle Dep. at 13; R.R. at 13a.

In making her payment determination, Provider argues Hearing Officer completely disregarded the Bureau's interpretation of the trauma care exception and regulations – that a trauma care provider is entitled to be paid *its* usual and customary charge. In so doing, Provider asserts Hearing Officer substituted her interpretation of the regulations for the construction the Bureau applied for nearly two decades in adjudicating trauma care fee review cases.

Provider further asserts this Court acknowledged the Bureau's position that trauma care charges were exempt from the usual medical fee caps in Roman Catholic Diocese and Laundry Owners. In both those cases, this Court affirmed the hearing officer's determinations that the provider's trauma care charges were exempt from the fee caps and the providers were entitled to 100% of their actual charges.

Provider argues the same deference to the Bureau's interpretation of the MCC Regulations should be afforded here with regard to the application of 34 Pa. Code §127.128. Provider asserts the Bureau's construction is consistent with the clear purpose of the Act to exempt acute trauma care from the fee caps in the Act's MCC provisions.

Further, Repricing Manager acknowledged that the Bureau's Medical Fee Review Section construes 34 Pa. Code §127.128 to require payment of 100% of the trauma care provider's billed charges. See Lengle Dep. at 16-17; R.R. at 16a-17a. Provider also maintains the Fee Review Section's position is consistent with Laundry Owners, where this Court noted the General Assembly intended the

14

acute trauma or burn care provision in Section 306(f.1)(10) of the Act, 77 P.S. §531(10), to be a specific exception to the Act's general fee cap provisions. Therefore, Provider asserts, Hearing Officer erred in determining the Act's medical fee cap calculations applied in this case.

## B. Analysis
### 1. Geisinger

To begin our analysis, we review our recent decisions in Geisinger and two companion cases,[4] where we addressed issues and arguments practically identical to the ones presented here. In Geisinger, the provider submitted a claim to Insurer seeking full payment of its billed charges for its physicians' treatment of the claimant rendered in a Level I trauma center. Insurer responded with an EOB that recognized the treatment and services as acute trauma care, but nevertheless repriced the provider's charges based on the usual and customary rates for that treatment in the provider's geographic area. The provider filed an application for fee review, and the Medical Fee Review Section determined Insurer owed the provider its actual charges for its acute trauma care treatment and services.

Insurer filed a timely request for a fee review hearing. At the hearing, Insurer provided testimony from the same Repricing Manager which was nearly identical to that presented in this case. Repricing Manager in Geisinger testified

___

[4] See Geisinger Health System and Geisinger Clinic v. Bureau of Workers' Compensation Fee Review Hearing Office, (Pa. Cmwlth., No. 1625 C.D. 2015, filed April 21, 2016), 2016 WL 1593754 (unreported) and Geisinger Health System and Geisinger Clinic v. Bureau of Workers Compensation Fee Review Hearing Office, (Pa. Cmwlth., No. 1626 C.D. 2015, filed April 21, 2016), 2016 WL 1593757 (unreported).

15

that in accord with the Bureau's Statement of Purpose, she used the 85th percentile of the MDR database to determine the usual and customary charge.

Hearing Officer agreed with Repricing Manager and determined Insurer's payment should be based on 100% of the usual and customary charge as defined in 34 Pa. Code 127.3 rather than 100% of Provider's actual charge. See Geisinger, ___ A.3d at ___, Maj. Slip. Op. at 5. Hearing Officer then determined Insurer properly reimbursed the provider at "100% of the usual and customary charge for services in that geographic reason for the services rendered to [the claimant]." Id.

In affirming Hearing Officer's order, the Geisinger Majority observed 34 Pa. Code §127.128(c) authorizes a trauma center to be reimbursed at the "provider's usual and customary charge for the treatment and services rendered" where the patient presents with immediately life threatening or urgent injuries. This language is identical to definition of "actual charge" in 34 Pa. Code §127.3. See Geisinger, ___ A.3d at ___, Maj. Slip. Op., at 10.

Nonetheless, the Geisinger Majority recognized Section 109 of the Act, a general definitions provision, defined the term "**[u]sual and customary charge**" as:

> the charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided.

16

77 P.S. §29. This definition is identical to that in 34 Pa. Code §127.3, the implementing regulation. The Geisinger Majority then reasoned (with emphasis added):

> The question then becomes whether, just because the General Assembly and those implementing the regulations chose to repeat the definition within other provisions but not in Section 306(f.1)(10), providers were to receive actual charges, notwithstanding how that term is defined in the Act. In determining whether a defined term has a meaning that differs from the definition given to it, we must take into consideration the 'context' and language that 'surrounds' the term. Pennsylvania Associated Builders and Contractors, Inc. v. Department of General Services, 932 A.2d 1271, 1279 (Pa. 2007). In this case, there is nothing in the context of the language surrounding the term to indicate that the statutory definition of 'usual and customary charges' means that a provider should receive its actual charges. If that were the case, the General Assembly would have drafted the pertinent part of Section 306(f.1)(10) to read 'a provider's customary and usual charge' rather than '*the* usual and customary charge.'

> We recognize that despite the language of the fee cap provisions, Section 127.128(c) of the MCC Regulations interprets Section 306(f.1)(10) of the Act as containing just that language. By doing so, it equates 'usual and customary charges' with its definition of 'actual charge' which states: 'The provider's usual charge and customary charge for a specific treatment, accommodation, product or service.' 34 Pa. Code §127.3 (emphasis added). While 34 Pa. Code §127.128(c) would indicate that reimbursement would be at the usual rate *if contained in the statute*, a regulation that is at variance with a statute is ineffective to change the statute's meaning. That is so because 'the power of an administrative agency to prescribe rules and regulations under a statute is not the power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by the statute.' Volunteer

17

Firemen's Relief Association of the City of Reading v. Minehart, 227 A.2d 632, 635-36 (Pa. 1967). 'When an agency adopts regulations at variance with the statute, the regulations, and not the statute, fall by the wayside.' Union Electric Corporation v. Board of Property Assessment, Appeals and Review of Allegheny County, 721 A.2d 823 (Pa. Cmwlth. 1998), rev'd on other grounds, [746 A.2d 581 (Pa. 2000)] ....

* * * *

The rules of statutory construction apply to administrative regulations. Bayada Nurses, Inc. v. Department of Labor and Industry, 958 A.2d 1050 (Pa. Cmwlth. 2008), aff'd, 8 A.3d 866 (Pa. 2010). A defined term is to be applied unless a different meaning can be ascribed to the word or phrase because of its context. Because there is nothing in the language of Section 306(f.1)(10) of the Act that indicates that 'usual and customary charge' is other than how it is defined in Section 109 of the Act as a 'charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided,' we affirm the Hearing Officer's order.

Geisinger, ___ A.3d at ___, Maj. Slip. Op., at 11-14 (footnotes omitted).

Despite the general conclusion that a comparison of other providers' charges could be made to reprice the cost of trauma care, the Geisinger Majority questioned the use of a database for that purpose. Id. at ___, n.4, Maj. Slip. Op. at 12, n.4. The Geisinger Majority held that a comparison should be made between the trauma care provider's charges and the usual and customary charges of other trauma centers in the same geographic region. Id. at ___, Maj. Slip. Op. at 14. The Concurring Opinion agreed with this position. Id. at ___, Conc. Slip. Op. at 2

18

("Thus, where trauma care is involved, the provider's charges are not compared to those of every 'Emergicare,' "Redicare,' or 'Urgent Care' facility; rather, the trauma care provider's charges are compared only to other 'Level I or Level II trauma center[s] accredited by the Pennsylvania Trauma Systems Foundation under the [A]ct of July 3, 1985, P.L. 164 … known as the 'Emergency Medical Services Act.' Section 306(f.1)(10) of the Act, Section 531(10).").

The Concurring Opinion in Geisinger described the database problem in more detail: "Specifically, there is no testimony whether the unidentified 'data' used by the repricing manager were limited to charges by accredited trauma care facilities in the same geographic region. In fact, there is no testimony that charges by accredited trauma care facilities are even included in the database." Id. at ___, Conc. Slip Op. at 3.

### 2. Present Case

In the present case, the circumstances are nearly identical to those in Geisinger. However, in Geisinger the provider did not sufficiently challenge the use of FAIR Health's MDR database. Geisinger, ___ A.3d at ___, n.4, Maj. Slip. Op., at 12, n.4. As such, the Court noted, "[b]ecause the use of this database was not challenged, we will accept [its] use in this case but do not in any way address its general applicability or validity." Id. (emphasis added). Likewise, the provider in Geisinger did not challenge Repricing Manager's reliance on the Bureau's Statement of Purpose, a document which does not appear to apply to repricing trauma care. See Geisinger, ___ A.3d at ___, Conc. Slip. Op. at 3-4 ("Worse, based on the 'Bureau's statement' referenced in the repricing manager's testimony

19

… there is every indication that the database was never intended to be used for trauma care repricing.") (footnote omitted).

In the present case, however, Provider raises specific assignments of error as to the Hearing Officer's acceptance of Repricing Manager's testimony and her reliance on the Bureau's Statement of Purpose, which Provider contends is only applicable to determining the proper payment amount under the fee cap provisions of the MCC Regulations. Thus, during Repricing Manager's deposition, Provider raised the following objection to her reference to the Statement of Purpose:

> I'm going to offer an objection here. Let me just put it on the record and then you can continue. That statement of purpose has absolutely no relevance to 127.128. It specifically refers only to the calculation under the fee caps for charges for which there is no fee schedule in the Workers' Compensation Fee Schedule. It made a specific reference for that provision that says that a 127.103, that if a medical allowance does not exist for a reported HCPCS [Healthcare Common Procedure Coding System] code or successor codes, provider shall be paid either 80 percent of the usual and customary charge or the actual charge. The statement of purpose has absolutely nothing to do with trauma. Its under the fee cap provisions of the Act regulations. And as your witness has testified, trauma charges are exempt from any Medicare cost-containment provisions.
>
> In fact, the regulation itself, it says, under C, that the charge shall also be at the provider's usual and customary charge for treatment and services rendered. That's how the Bureau interprets it. That's how they apply it. They applied it in this case. That's how the Commonwealth Court has applied it.

> So I'm going to object to any testimony regarding this statement of purpose which has absolutely nothing to do with trauma matters. But you can go ahead and ask, and the legal issue will be resolved, but I want to put that on the record.

Lengle Dep. at 12-13; R.R. at 12a-13a (emphasis added). Ultimately, Hearing Officer overruled Provider's objection. See Hearing Officer's Op. at 4, n.1.

In her decision here, Hearing Officer concluded: "In the instant matter, Insurer has met its burden of proving that it properly utilized the definition of 'usual and customary charge' and that Provider was due reimbursement at the 85th percentile of the MDR database published by FAIR Health. Insurer has proven by a preponderance of the evidence that Provider is not due additional payment for the services rendered to Claimant from October 8, 2014 through October 16, 2014." C.L. No. 3.

Based on our review of Repricing Manager's testimony as a whole, and on our recent decision in Geisinger, we hold Hearing Officer erred in reaching this determination. First and foremost, Repricing Manager acknowledged the database she used had nothing to do with Provider's usual and customary charges for trauma care. Lengle Dep. at 14; R.R. at 14a.

Second, in Geisinger we determined that a comparison can be made between an accredited trauma care provider's charges and charges by other accredited trauma care centers in the same geographic region. However, there is no evidence here that the MDR database is limited to such data, or even contains such data.

21

In conclusion, we agree with the Hearing Officer that Provider need not be reimbursed at 100% of Provider's <u>actual</u> charges for trauma care. Instead, pursuant to <u>Geisinger</u>, Provider's trauma care charges can be compared to charges by other accredited trauma care centers in the same geographic region to arrive at the "usual and customary charge" for trauma care. Reimbursement is to be made at 100% of such charge. However, we respectfully disagree with the Hearing Officer that the Bureau's Statement of Purpose has any relevance to trauma care charges. Consequently, the current record lacks substantial evidence to support the use of the MDR database published by FAIR Health in this trauma care case. Thus, Findings of Fact 10e and 10f, quoted above, must be stricken.

For the foregoing reasons, we reverse the decision of the Hearing Officer, and we remand for a determination of the "usual and customary charge" by accredited trauma care providers in the geographic area of Provider here. Provider shall be reimbursed at 100% of that charge. We leave to the thoughtful discretion of the Hearing Officer whether or not to supplement the record on remand.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny General Hospital,       :
                    Petitioner    :
                               :
           v.               :    No. 1945 C.D. 2015
                               :
Bureau of Workers' Compensation  :
Fee Review Hearing Office      :
(State Workers' Insurance Fund),   :
                  Respondent  :

## O R D E R

AND NOW, this 6th day of July, 2016, the order of the Bureau of Workers' Compensation Fee Review Hearing Office is **REVERSED** and this case is **REMANDED** for further proceedings consistent with the foregoing opinion. Jurisdiction is relinquished.

 

 

                             _____
                             ROBERT SIMPSON, Judge