# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

American Select Insurance     :
Company,     :
               Petitioner     :
    :
          v.     :     No. 1366 C.D. 2024
    :
York Hospital c/o Wellspan Health     :
(Bureau of Workers' Compensation     :
Fee Review Hearing Office),     :
               Respondent     :     Submitted: December 8, 2025


BEFORE:     HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE MATTHEW S. WOLF, Judge


## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                                     FILED: March 27, 2026

American Select Insurance Company (Insurer) petitions this Court for review of a September 19, 2024 order by Workers' Compensation Fee Review Hearing Officer (Hearing Officer) Colleen Pickens denying Insurer's Request for Hearing to Contest Fee Review Determination (Request) and directing Insurer to pay the remaining $98,967.61 on York Hospital's (Provider) $142,460.54 total bill for treatment administered to the late Mary Frey (Claimant). Because Hearing Officer Pickens' order is supported by substantial evidence in the record, we affirm.

# I. Factual Background

The tragic incident giving rise to the instant case is not a matter of dispute between the parties. On the morning of July 8, 2022, Claimant was on the premises of Smith Auctioneers, LLC, her employer, when she fell down a flight of 13 steps and landed headfirst on a concrete floor. Insurer's Br., App. A, FRHO Decision, Finding of Fact (F.F.) No. 3. Claimant was immediately taken to Provider's trauma bay, where she presented at 9:02 a.m. with a four-centimeter gash on her left scalp and extreme hypertension. *Id*. Doctors assigned Claimant a Glasgow Coma Scale score of three, indicating non-responsiveness to all stimuli. *Id*. After a CT scan was conducted later that day, doctors discovered large subdural and subarachnoid hemorrhages and a skull fracture and diagnosed Claimant with a severe traumatic brain injury as well as hypoxic respiratory failure. *Id*., F.F. No. 4. Claimant underwent an emergency right-sided decompressive craniotomy; duraplasty; evacuations of two, large hematomas, and a temporal lobectomy. *Id*., F.F. No. 5. The postoperative diagnosis was of a "right-sided acute subdural hematoma with 1.2 cm of right-to-left midline shift and uncal herniation in the setting of extensive temporal and frontal contusions[,] with traumatic subarachnoid hemorrhage." *Id*., F.F. No. 5(a). Claimant's condition continued to deteriorate following the surgery until she died as a result of her injuries on the morning of July 10, 2022. *Id*., F.F. No. 7.

On July 29, 2022, Provider sent Insurer a bill for the treatment and services rendered to Claimant from July 8, 2022, until July 10, 2022, requesting payment of $142,460.54. *See* Reproduced Record (R.R.) at 4a. On each of the itemized bill's 11 pages, Provider had stamped the word "trauma" in capital letters. *Id.* at 5a-

15a. In response, Insurer's representative, WellRithms,[1] sent Provider a check for $43,492.43. *See id*. at 18a. In an accompanying Explanation of Review, WellRithms stated that it had identified $98,407.61 in reductions to the amount requested "based upon [g]overnment, [c]ommercial, and [p]rivate [p]ayer data." *Id.* at 18a-19a. Among the adjusted payments listed by WellRithms was a $1,607.28 payment for anesthesia services, a $1,992.72 reduction from the $3,600.00 initially billed by Provider. *Id*. at 19a.

In response, Provider submitted an Application for Fee Review to the Workers' Compensation Bureau (Bureau) maintaining that the remainder of the full amount initially requested was still due from Insurer. R.R. at 1a-2a. Following an investigation, the Medical Fee Review section determined that the amount due to Provider was $98,967.61, plus 10% yearly interest. *Id*. at 206a. Insurer then submitted its Request to the Bureau, explaining that the "amount originally paid to Provider was consistent with Provider's usual and customary charges for the services provided." *Id*. at 527a. In addition, Insurer contended that Section 306(f.1)(10) of the Act[2] as well as Section 127.128(a) of the Act's Medical Cost Containment (MCC) Regulations[3] unconstitutionally delegated the legislature's authority. *Id*.

## II. Procedural Background

### A. Witnesses' Initial Testimony

The matter was initially assigned to Hearing Officer Derrick Coker, who held an evidentiary hearing on July 17, 2023. R.R. at 217a. Insurer first presented the

---

[1] WellRithms describes itself as "a third-party payment integrity company that specializes in high-dollar, complex medical bills." R.R. at 447a.

[2] Act of June 2, 1915, P.L. 736, *as amended*, added by the Act of July 2, 1993, P.L. 190, 77 P.S. § 531(10).

[3] Section 127.128(a) provides that charges for "[a]cute care" are exempt from the Act's normal fee caps if the patient has an immediate life-threatening or urgent injury and the services are provided in an accredited trauma center or burn facility. 34 Pa. Code 127.128(a).

brief testimony of Dr. Ira Weintraub, who identified himself as WellRithms' chief medical officer and a 38-year veteran orthopedic surgeon. *Id.* at 233a. When Provider objected to the presentation of Dr. Weintraub's testimony as an expert on workers' compensation medical billing, Insurer's counsel explained that Dr. Weintraub was only testifying on "foundational issues" related to treatment. *Id.* at 234a. After summarizing the circumstances of Claimant's injury, Dr. Weintraub was asked if he believed there was any dispute as to whether the care was properly defined as trauma care; Dr. Weintraub responded, "[n]ot at all." *Id.* at 236a. Provider's counsel had no questions for Dr. Weintraub on cross examination. *Id.*

Insurer next presented the testimony of Jordan Weintraub, a WellRithms employee whom Insurer described as "an expert in medical bill review and analysis based on her experience in the field." R.R. at 240a. Ms. Weintraub acknowledged that she did not hold a degree or any particular certifications in billing, bill coding, or auditing, but explained that she had served as WellRithms' vice president of claims for approximately five and a half years, and that she had a total of nine years' experience in medical bill review. *Id.* at 239a, 242a. Like Dr. Weintraub, Ms. Weintraub did not dispute that the care administered to Claimant was properly classified as trauma care. *Id.* at 254a.

Regarding the billing dispute, Ms. Weintraub explained that WellRithms' repricing of the amount due to Provider was based on three categories of data. R.R. at 245a. The first category consisted of cost transparency data that Provider, like all hospitals, is legally required to disclose regarding its charges for all services. *Id.* For WellRithms' purposes, the most important information that WellRithms expected to find in the cost transparency data were charges arranged by diagnostic-related grouping (DRG), a number that catalogs services according to diagnosis and

4

treatment. *Id.* at 251a. Ms. Weintraub explained that the relevant DRG in this case was 955, the number representing a craniotomy for multiple significant trauma. *Id.* at 253a. However, Ms. Weintraub contended that Provider's charges for DRG 955, or any other DRG, were absent from the file containing its cost transparency data. *Id.* at 246a.

The second category consisted of charge information from Hershey Medical Center (Hershey), which Ms. Weintraub identified as the other level one trauma center closest to Provider's campus.[4] Ms. Weintraub recalled that the Hershey transparency data were garnered from a page on Hershey's website, bearing the heading "Understanding Your Care," which displayed Hershey's gross charges for all DRGs. R.R. at 264a, 270a. Most relevantly, the Hershey data contained the gross and average charge for DRG 955, which is based on an 11.1-day average length of stay. *Id.* at 273a. Ms. Weintraub explained that WellRithms used that number to prorate the charges for a stay that was shorter or longer than the 11.1-day average. *Id.*

Third, WellRithms examined Provider's Medicare cost report. R.R. at 246a-47a. Ms. Weintraub described the document as "an annual report where every hospital in the country is reporting [its] expenses, all [its] costs, from the staff it takes to run that department to the electricity." *Id.* at 246a-47a. The key component of that report for WellRithms' purposes was the cost-to-charge ratio assigned to each DRG. Ms. Weintraub described the cost-to-charge ratio as "a reporting mechanism so that Medicare knows of all of the costs and charges" in order to determine the

---

[4] WellRithms also examined cost transparency data from Holy Spirit Medical Center and Select Specialty Hospital. R.R. at 246a. However, Hearing Officer Coker sustained Provider's objection to the inclusion of those data on the ground that those hospitals, unlike Provider and Hershey, were not level one trauma centers. *Id.* at 255a-56a.

proper federal reimbursement. *Id.* at 269a. Ms. Weintraub acknowledged that Provider's Medicare cost report was obtained not from Provider directly but from the website of the American Hospital Directory. *Id.* at 264a.

Based on her review of the foregoing data, Ms. Weintraub maintained that the $43,492.93 already paid to Provider was consistent with the usual and customary reimbursement for the services rendered. R.R. at 262a. Ms. Weintraub explained that research performed subsequent to the payment of the bill confirmed the amount initially calculated by WellRithms. *Id.* at 263a.

At this point in Ms. Weintraub's testimony, Hearing Officer Coker raised a concern for the first time with her admission as an expert, reasoning that she could not give an expert opinion without unspecified "certifications." R.R. at 257a-58a. Hearing Officer Coker observed that "there's a precedent named *Fry[e]* that deals with scientific experts."[5] *Id.* at 258a. Insurer's counsel asserted that *Frye* was a federal court case, and that the Pennsylvania Rules of Evidence require only that the witness possess knowledge "beyond that of the average layperson," rather than specific certifications.[6] *Id.* at 258a-59a. Hearing Officer Coker acknowledged that Ms. Weintraub had laid a foundation to offer an opinion based on her experience but announced that he would not "view that as an expert opinion." *Id.* at 260a.

At an October 26, 2023 hearing, Provider presented the testimony of Timothy Mosco, a senior principal at SunStone Consulting. R.R. at 289a. Mr. Mosco described SunStone as "a healthcare reimbursement and regulatory consulting

---

[5] It may be presumed that Hearing Officer Coker was referring to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[6] Pennsylvania Rule of Evidence 702(a) provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson." Pa.R.E. 702(a).

firm." *Id.* at 296a. At SunStone, Mr. Mosco explained, he managed a staff of 20 medical claim specialists responsible for following the life cycle of a medical bill and for determining whether a response to a payment, such as a Fee Review Application, is required. *Id.* at 296a-97a. Like Dr. Weintraub and Ms. Weintraub, Mr. Mosco did not hold degrees or certifications in medical billing, coding, or auditing, but he did possess a degree in finance. *Id.* at 297a. Insurer's counsel objected that Mr. Mosco's expert testimony should be rejected on the same basis that Hearing Officer Coker rejected Ms. Weintraub's testimony, but Hearing Officer Coker overruled the objection. *Id.* at 302a.

Regarding the hospital billing process, Mr. Mosco explained that the charges for services rendered to a patient accumulate until the patient is discharged, at which point the hospital generates a bill. R.R. at 304a. Mr. Mosco testified that the amount billed for each item is taken from a hospital's chargemaster.[7] *Id.* at 305a. Individual stays in an intensive care unit (ICU) may vary greatly in the charges incurred, however, based on the nature of the ICU visit. *Id.* at 309a. For this reason, Mr. Mosco opined that WellRithms' reliance on Medicare cost reports was problematic, given that those reports do not reflect the factors behind each line-item charge on an actual bill. *Id.* at 316a-17a. Thus, while Mr. Mosco acknowledged that the Medicare prices in WellRithms' Explanation of Reimbursement were accurate, he disputed the notion that those figures could be used to "reverse engineer" appropriate charges in a specific case. *Id.* at 332a.

Mr. Mosco also noted that pharmacy charges are an exception to the normal practice of applying charges from a hospital chargemaster, since they are billed separately when the pharmacy items are dispensed to the patient. R.R. at 305a.

---

[7] A chargemaster is "[a] provider's listing of current charges for procedures and supplies utilized in the provider's billing process." Section 127.3 of the MCC, 34 Pa. Code § 127.3.

While specific drugs may be mentioned on the chargemaster, he explained, "the pharmacy formulary is what ultimately determines what [the] price will be when it hits the patient's bill." *Id.* Mr. Mosco maintained that this has been the industry's normal practice during his 32 years of experience in it. *Id.*

Additionally, Mr. Mosco took issue with WellRithms' reliance on DRG codes in its attempt to establish usual and customary charges. R.R. at 335a-36a. Mr. Mosco explained that DRG codes are assigned to similar conditions, which, while perhaps similar in their treatment, differ in their severity, prognosis, outcome, treatment difficulty, intervention need, and resource intensity. *Id.* at 335a. Thus, hospital stays assigned the same DRG number can vary drastically in the amount ultimately billed. *Id.* at 336a.

With regard to DRG 955, Mr. Mosco noted that Provider had admitted three patients whose care was assigned that code number since 2018. R.R. at 339a. Besides Claimant, whose 2-day stay incurred a $142,460.54 bill, a 2018 patient was billed $110,420.89 for a 4-day stay, while a 2021 patient was billed $647,979.62 for a 19-day stay. *Id.* at 339a-41a. Mr. Mosco declined to quantify the resource intensity required in Claimant's case, as he was not a doctor. *Id.* at 345a. However, when asked whether he believed that the charges in Provider's bill to Insurer reflected the usual and customary charges for a level one trauma center in Provider's geographic area, Mr. Mosco simply responded: "For the usual and customary for [Provider], yes." *Id.* at 325a.

### B. Rebuttal Testimony

Both parties presented rebuttal testimony at a May 2, 2024 hearing, held shortly after the matter was reassigned to Hearing Officer Pickens. At that hearing, Ms. Weintraub testified that she relied on the Hershey chargemaster for DRG 955

treatment because Provider did not publish its charges in its transparency data.  R.R. at 376a.  Based on a document she identified as the Hershey chargemaster, Ms. Weintraub calculated that Hershey would have charged approximately $86,500.00 for the treatment given to Claimant.  *Id.* at 378a-79a.  As for Provider's pharmacy charges, Ms. Weintraub testified that she had no choice but to give Provider "the benefit of the doubt" and accept its full charges, since Hershey's chargemaster did not include pharmacy charges, an omission she described as "highly unusual."  *Id.* at 379a-80a.  While maintaining that WellRithms' original reimbursement was proper, Ms. Weintraub acknowledged that an $86,500.00 bill would be "a much more reasonable alternative" to the amount actually billed to Insurer.  *Id.* at 380a.

Ms. Weintraub further maintained that Provider's own data suggested a significant overcharge, pointing to the two other cases in recent years when Provider administered treatment under code number DRG 955.  R.R. at 382a.  The $110,420.89 bill incurred by the 2018 patient for a four-day stay reflected in *per diem* charges of approximately $27,600.00.  *Id.*  As for the 2020 patient, the $648,000.00 bill for the 19-day stay in that case resulted in *per diem* charges of approximately $34,100.  *Id.*  Ms. Weintraub contrasted those cases with what she described as Claimant's 2-day stay, for which Insurer was billed approximately $71,000.00 per day.  *Id.* at 382a-83a.

On cross examination, Ms. Weintraub was shown a page from what Provider's counsel identified as the transparency disclosures on Hershey's website. R.R. at 401a; *see also id*. at 507a-11a.  A chart on that web page included a column, bearing the heading "Gross or Average Charge," which, Ms. Weintraub recalled, may have been the source of the data WellRithms cited as Hershey's chargemaster figures.  *Id.* at 402a-03a.  However, Ms. Weintraub acknowledged that she could not

9

remember the exact source of her data. *Id.* at 403a. When shown Hershey's actual chargemaster, Ms. Weintraub acknowledged that she had not seen it before. *Id.* at 407a. Ms. Weintraub also admitted that she was "not sure how the hospitals come up with any of the charges," and that it often seemed to her "like they pick a lot of them out of thin air." *Id.* at 413a.

Dr. Weintraub also gave rebuttal testimony at the May 2, 2024 hearing, largely to reiterate his position that the charges sent to Insurer were significantly inflated. In particular, Dr. Weintraub called attention to the charges for anesthesia, which Provider assigned a revenue code of 370. R.R. at 419a. Dr. Weintraub opined that revenue code 370 functions normally as a placeholder and that the actual charges (such as for the anesthesiologist) are bundled into operating room charges; yet, Dr. Weintraub explained, Provider had billed insurer for $3,600.00 in expenses under revenue code 370. *Id.* at 420a; *see also id.* at 468a. *Id.* at 428a-29a.

In addition, Dr. Weintraub took issue with Mr. Mosco's suggestion that the relatively high charges for Claimant's care were warranted by a need for greater resource intensity. Dr. Weintraub opined that elevated charges would be justified if "multiple trauma components were addressed," but that Claimant "died so quickly" that this did not occur. R.R. at 423a. Citing his own experience as "a neurosurgically trained trauma guy," Dr. Weintraub observed that a craniotomy performed to relieve pressure on the brain "is a relatively straightforward surgery." *Id*. Here, Provider's counsel objected to Dr. Weintraub's testimony on the basis that it was beyond the scope of rebuttal testimony and should have been included in Insurer's case-in-chief. *Id.* at 424a. Insurer's counsel asserted that the testimony was necessary to rebut "testimony from a non-doctor regarding resource intensity." *Id.* Hearing Officer Pickens sustained Provider's objection. *Id.* at 425a.

10

In surrebuttal testimony, Mr. Mosco first rejected the contention that revenue code 370 was a mere placeholder, asserting that anesthesia was properly billed to insurer under that revenue code. R.R. at 434a. Mr. Mosco explained that there are indeed circumstances in which Provider would expect payment for expenses listed under revenue code 370, particularly for workers' compensation trauma care. *Id.* at 436a. While acknowledging that he did not review the record to confirm that the precise billing amount was appropriate, Mr. Mosco maintained that Provider "expect[ed] to be paid full charges for th[at] claim." *Id.* at 435a. Mr. Mosco also disputed Ms. Weintraub's contention that the omission of pharmacy charges from Provider's chargemaster was unusual, explaining that pharmacy charges are billed separately when pharmacy items are dispensed to the patient. *Id.* at 437a. Finally, Mr. Mosco reiterated his position that WellRithms' focus on DRG codes was misplaced, given that they are primarily a tool used for Medicare reimbursement, which is irrelevant in cases involving trauma care. *Id.* at 436a.

### C. Hearing Officer Pickens' Decision

In a September 19, 2024 order, Hearing Officer Pickens denied the Request and directed Insurer to pay the remaining $98,967.61 requested by Provider, plus 10% yearly interest. In an accompanying opinion, Hearing Officer Pickens credited Mr. Mosco's testimony, in particular his assertion that "DRG codes are not related to charges and cannot be used to determine a provider's usual and customary charges." Hearing Officer Decision, F.F. No. 35(f). Hearing Officer Pickens found as fact that DRG codes are merely a classification tool and that "costs could vary greatly within the same DRG code" depending on such factors as illness severity and difficulty of treatment. *Id.* While acknowledging that the *per diem* charges for Claimant's treatment were higher than those for Provider's treatment of DRG 955

11

cases in 2018 and 2021, Hearing Officer Pickens rejected the suggestion that Claimant's 2-day admission should have been billed for less, since "neither Insurer's witnesses nor Provider's witness could state with any certainty whether Claimant's case required a low, average, or high resource intensity" compared with those two previous cases. *Id.* Hearing Officer Pickens also found as fact "that Provider's usual and customary charges cannot be determined based upon charges made by Hershey" for DRG 955 treatment, since "it is expected and logical that charges for DRG [] 955 can vary greatly among different facilities, even facilities within the same geographic location." *Id.*

In contrast to Mr. Mosco's testimony, Hearing Officer Pickens found Ms. Weintraub's to be lacking in credibility, as she admitted during cross examination "that she performed no independent analysis regarding what constituted 'reasonable' charges and is aware only that these charges are based upon Medicare cost reports." Hearing Officer Decision, F.F. No. 35(f). Such information was, according to Hearing Officer Pickens, "irrelevant" because "reasonable" charges are not necessarily identical to "usual and customary" charges. *Id.*, F.F. No. 34(k). Hearing Officer Pickens also noted that WellRithms' credibility was "call[ed] into question" by other aspects of Ms. Weintraub's testimony, such as her confusion of a hospital's chargemaster with its transparency data (which, unlike the chargemaster, reflects reimbursements). *Id.*, F.F. No. 34(f).

For similar reasons, Hearing Officer Pickens disagreed that the page from Hershey's website submitted by Insurer was the same as its chargemaster. Hearing Officer Decision, F.F. No. 35(g). Hearing Officer Pickens explained that "the testimony and evidence presented by Insurer with regard to . . . what it categorized as Hershey's chargemaster [was] too unclear and too ambiguous for the undersigned

Hearing Officer to determine with any degree of certainty whether the data . . . came from Hershey's actual chargemaster" or from another source, such as Hershey's transparency data. *Id.* Accordingly, Hearing Officer Pickens found as fact that "the charges described by Insurer as coming from Hershey's chargemaster cannot be utilized to determine the 'charge most often made by providers of similar training, experience[,] and licensure.'" *Id.* On the other hand, Hearing Officer Pickens credited Mr. Mosco's contention that the charges sent to Insurer were properly taken from Provider's chargemaster. *Id.*

Specifically addressing pharmacy charges, Hearing Officer Pickens agreed with Mr. Mosco that drug charges are calculated based on a pharmacy formulary and are not typically included in a hospital's chargemaster. Hearing Officer Decision, Discussion. Hearing Officer Pickens also found no evidence that Provider had improperly unbundled anesthesia charges under revenue code 370 from its operating room charges. *Id.*, F.F. No. 35(l). Thus, in the absence of any evidence that the $3,600.00 billed for anesthesia was not usual and customary, Hearing Officer Pickens found $1,992.72 for anesthesia still owed to Provider. *Id.*

Finally, Hearing Officer Pickens preserved Insurer's constitutional arguments for further appeal to this Court. *Id.* This appeal followed.[8,9]

### III. Issues

On appeal, Insurer presents four main issues, which we reorder for ease of disposition. First, Insurer maintains that Sections 306(f.1)(10) is an unconstitutional

---

[8] Our review is limited to determining whether a hearing officer's findings are supported by substantial evidence and whether the hearing officer erred as a matter of law or violated Employer's constitutional rights. *Roman Cath. Diocese of Allentown v. Bureau of Workers' Comp., Fee Review Hearing Office (Lehigh Valley Health Network)*, 33 A.3d 691, 696 n.5 (Pa. Cmwlth. 2011).

[9] Upon petitioning this Court for review of the decision below, Insurer also requested supersedeas, which we granted in a January 17, 2025 order.

delegation of the legislature's authority. Second, Insurer argues that Hearing Officer Pickens capriciously disregarded competent evidence, abused her discretion over factual matters, and failed to issue a reasoned decision supported by substantial, competent evidence. Third, Insurer contends that Hearing Officer Pickens "erroneously ordered [Insurer] to pay Provider's usual and customary charge rather than 'the' usual and customary charge." Insurer's Br. at 34 (citing 77 P.S. § 531(10)). Lastly, Insurer maintains that Hearing Officer Pickens erred when she credited Mr. Mosco's testimony that pharmacy charges are found in a separate formulary rather than a hospital chargemaster.

Provider rejoins that Insurer lacks standing to challenge the constitutionality of Section 306(f.1)(10); in the alternative, Provider asserts that the provision does not unconstitutionally delegate the legislature's authority. In addition, Provider urges this Court to affirm Hearing Officer Pickens' decision on the ground that it is supported by substantial, competent evidence of record.

## IV. Discussion

### A. Constitutionality of Section 306(f.1)(10)

Normally, fees for medical services under the Act are capped at 113% of the applicable Medicare reimbursement rate. *See* 34 Pa. Code § 127.101(a). Under Section 306(f.1)(10) of the Act, an exception arises when a Level I or Level II trauma center provides "acute care . . . in an acute care facility to a patient with an immediately life threatening or urgent injury[.]" 77 P.S. § 531(10). In turn, Section 109 of the Act provides that life-threatening injury "shall be as defined by the American College of Surgeons' triage guidelines regarding use of trauma centers for the region where the services are provided.*" Id*. § 29. In such instances, "the amount of payment shall be the usual and customary charge" rather than the Medicare

14

reimbursement rate. *Id.* § 531(10); *see also* Section 127.128(a) of the MCC Regulations (providing that charges for acute care "shall be paid based on 100% of usual and customary charges").

Insurer argues that Section 306(f.1)(10) of the Act improperly authorizes the American College of Surgeons to decide what constitutes a life-threatening or urgent injury. According to Insurer, "the American College of Surgeons has revised its triage guidelines three times, most recently in 2021," thus creating the possibility that an injury not deemed to have been life-threatening or urgent in 1993 (when the General Assembly added the trauma exception provisions to the Act) may qualify as such today. Insurer's Br. at 28-29. Insurer argues that the question of whether the injury at issue meets the American College of Surgeon's current definition of life-threatening or urgent may thus "impact the amount an insurer must pay to a provider to the tune of tens of thousands or even hundreds of thousands of dollars." *Id.* at 28. Provider rejoins that Insurer lacks standing to challenge the provisions' constitutionality, because even Dr. Weintraub and Ms. Weintraub agreed that the care administered to Claimant was properly defined as trauma care.

Traditionally, the concept of standing is focused on "the idea that a person who is not adversely impacted by the matter he seeks to challenge does not have standing to proceed with the court system's dispute resolution process." *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 659 (Pa. 2005) (internal citations omitted). The standing requirement arises from the principle that judicial intervention is only appropriate where the underlying controversy is real and concrete; thus, a controversy is only worthy of judicial review if the individual initiating the action has been *aggrieved*. *Id*. at 659-60. A party is aggrieved if it can establish a substantial, direct, and immediate interest in the outcome of litigation.

15

*Id.* at 660. The party's interest is substantial if it is one that surpasses the common interest of all citizens in procuring obedience to the law; it is direct if it requires a causal connection between the asserted violation and the complained-of harm; it is immediate if the causal connection is neither remote nor speculative. *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018) (en banc).

We agree with Provider that Insurer has failed to establish standing to challenge the trauma exception's constitutionality in this case, though for a slightly different reason from the one Provider proffers. In this case, it is undisputed that Claimant was immediately admitted to Provider's trauma bay and died from her injuries after just two days' hospitalization as a direct result of the work incident. Insurer does not argue that Claimant's injuries would have been excluded from the definition of "life-threatening" under any of the prior versions of the American College of Surgeons triage guidelines. The seriousness of Claimant's injuries precludes that argument, and Insurer does not so much as try to make it. Instead, it contends that because the triage guidelines have changed, some undefined injuries could be subject to different treatment under different versions. This is insufficient to confer standing to challenge the alleged unconstitutional delegation in this case. *See Pittsburgh Palisades Park, LLC v. Com.*, 888 A.2d 655, 659-60 (Pa. 2005) (explaining that the concept of standing arises from the principle that judicial intervention is only appropriate where the underlying controversy is real and concrete; thus, a controversy is only worthy of judicial review if the individual initiating the action has been aggrieved). We therefore decline to engage with the merits of Insurer's arguments regarding the constitutionality of the trauma exception's provisions.

16

**B. Evidentiary Determinations**

Significantly, Section 306(f.1)(10)'s reference to "usual and customary charges" does not mean the actual charges stated on the bill; rather, Section 109 of the Act defines the phrase as the "charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service, in the geographic area where the treatment, accommodation, product[,] or service is provided." 77 P.S. § 29. As this Court has observed, there is "nothing in the context of the language surrounding the term to indicate that the statutory definition of 'usual and customary charges' means that a provider should receive its actual charges." *Geisinger Health Sys. v. Bureau of Workers' Comp. Fee Rev. Hearing Off.*, 138 A.3d 133, 138 (Pa. Cmwlth. 2016). Rather, an insurer may calculate the usual and customary charges by comparing the provider's full charges with those of other accredited trauma care centers in the same geographic region and reimburse at that recalculated amount. *Allegheny Gen. Hosp. v. Bureau of Workers' Comp. Fee Rev. Hearing Off.*, 143 A.3d 449, 459 (Pa. Cmwlth. 2016). When challenged by a provider through a fee review petition, the insurer has the burden of proving by a preponderance of evidence that its reimbursement was proper. *Phila. Surgery Ctr. v. Excalibur Ins. Mgmt. Servs., LLC*, 289 A.3d 157, 162 (Pa. Cmwlth. 2023).

Instantly, Insurer maintains that it met its burden of proving that its $43,492.43 payment was proper, and that its evidence was capriciously disregarded by the Hearing Officers. In particular, Insurer argues that the Hearing Officers erred by disallowing Ms. Weintraub's testimony as an expert, by inconsistently applying evidence from Provider's and Hershey's chargemasters, and by sustaining Provider's objection to Dr. Weintraub's testimony regarding resource intensity.

17

First, we address Insurer's charge that Hearing Officer Coker erroneously failed to accept Ms. Weintraub's testimony as that of an expert. In Insurer's view, Hearing Officer Coker "erroneously concluded that certain unspecified 'certifications' were a condition precedent to qualification as an expert." Insurer's Br. at 39. Insurer further points out that Hearing Officer Coker's reference to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) was inapt. Lastly, Insurer contends that it was prejudiced by Hearing Officer Coker's seemingly contradictory decision to admit Mr. Mosco's expert testimony, given that he, too, lacked relevant certifications.

We are not persuaded that the testimony of Ms. Weintraub was improperly disregarded. While we agree with Insurer that Hearing Officer Coker appeared to contradict himself on the admissibility of Ms. Weintraub's testimony as an expert and that *Frye* is inapposite in her testimony, we must also conclude that he did not unfairly prejudice Insurer in any meaningful way. After all, Ms. Weintraub was permitted to continue testifying based on her professional experience in medical billing and on her handling of the bill in this case.

Second, Insurer contends that Hearing Officer Pickens' consideration of chargemaster evidence was inconsistent and contradictory. Insurer explains that Hearing Officer Pickens "failed to consider testimony regarding the chargemaster data for Hershey [] based on the chargemaster, itself, not being part of the record"; yet, "Mr. Mosco's testimony regarding [Provider's] chargemaster data was accepted." Insurer's Br. at 41. In Insurer's view, the discrepancy in treatment constitutes "a double standard against [Insurer]." *Id.*

Insurer's argument is, again, unavailing. At the outset, we note that Insurer—not Provider—bore the burden of proof in this case and that, if it wanted Hershey's

18

chargemaster data admitted into the record, it fell on Insurer to offer it into evidence. Furthermore, we note that Ms. Weintraub's testimony on what she believed to be Hershey's chargemaster was deemed "too unclear and too ambiguous . . . to determine with any degree of certainty whether the data . . . came from Hershey's actual chargemaster." Hearing Officer Decision, F.F. No. 35(g). As noted, we will not overturn a hearing officer's credibility determinations absent an abuse of discretion. As Hearing Officer Pickens' determination is reasoned and supported by record evidence, we have no occasion to do so in this instance.

Third, Insurer claims that Hearing Officer Pickens excluded testimony about resource intensity, then concluded that the lack of such evidence weakened Insurer's case. Insurer explains that, after Mr. Mosco testified that *per diem* charges for the same DRG code may vary greatly depending on the need for fewer or greater resources, it was necessary to offer "testimony regarding the complexity of care (or lack thereof) provided to the patient and [to] explain how the resource intensity would be lower for this admission than [for] other admissions of the same DRG"; yet, Hearing Officer Pickens unfairly deprived Insurer of an opportunity to present such testimony or argument. Insurer's Br. at 43.

We, again, find Insurer's argument unpersuasive. When Insurer presented its case-in-chief at the July 17, 2023 hearing, Dr. Weintraub never discussed the intensity of the resources that Provider put into its effort to save Claimant's life. Instead, Dr. Weintraub's testimony at that hearing was limited to a brief summary of the work injury and an acknowledgment that Provider's treatment was properly deemed trauma care. At the following hearing, Mr. Mosco never made the specific assertion that Claimant's two-day stay required a greater intensity of resources on a daily basis than Provider's previous cases involving similar treatment; in fact, Mr.

19

Mosco declined to speculate on that point. Rather, his testimony regarding differences in resource intensity was only part of his explanation of why DRGs are inadequate to address medical billing issues. *See* R.R. at 334a-37a. Thus, when Dr. Weintraub attempted to offer his opinion about what resources Claimant's treatment must have required, it was not a rebuttal to any statement made by Mr. Mosco but the introduction of a new theory of the case. By sustaining Provider's objection to that testimony, Hearing Officer Pickens acted within her proper discretion.

### C. Application of Section 306(f.1)(10)

Next, Insurer argues that Hearing Officer Pickens erred by ordering payment of "Provider's usual and customary charge rather than 'the' usual and customary charge." Insurer's Br. at 34. Insurer points to Section 127.3 of the Act's MCC regulations, which provides that the usual and customary charge is that "most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service is provided." *Id.* (quoting 34 Pa. Code § 127.3). Contrary to the clear instruction in the Act and MCC regulations, Insurer argues, Hearing Officer Pickens failed to examine "what similar providers in the same geographic area have historically charged for the same care." *Id.* at 38.

Insurer's argument is unpersuasive. While it is certainly true that insurers are only required to submit payment for the usual and customary charges for trauma care rather than the provider's actual charge, we must note again that it was Insurer's burden to establish that its payment amount was proper. Insurer attempted to do so with three categories of evidence: the cost transparency data that Provider is required to submit pursuant to Medicare regulations, Provider's Medicare cost report (as garnered from the American Hospital Directory), and a document that Ms. Weintraub identified in her testimony as Hershey's chargemaster. The first two

20

categories were found insufficient based on Mr. Mosco's credited testimony that Medicare data cannot be used to "reverse engineer" the charges in a particular case, R.R. at 332a; furthermore, Hearing Officer Pickens found that Medicare data are "irrelevant" to the issue of trauma care charges, which are expressly exempt from Medicare price caps. FRHO Decision, F.F. No. 34(j)-(k). As for the third category, Insurer never submitted Hershey's actual chargemaster as an exhibit but only offered Ms. Weintraub's testimony that she had obtained Hershey's chargemaster figures from its website. However, Hearing Officer Pickens declined to credit that testimony, finding that Ms. Weintraub expressed uncertainty as to whether the data she used came from Hershey's chargemaster at all. Because Hearing Officer Pickens' conclusions are well supported by the record, we decline to overturn them.

### D. Pharmacy Charges

Finally, Insurer argues that Hearing Officer Pickens erred by ordering payment of the full amount billed for Provider's pharmacy charges. Insurer points to the testimony of Dr. Weintraub that Provider's $3,600.00 bill for anesthesia under revenue code 370 was significantly inflated. *See* R.R. at 420a. Rather than credit his testimony, Insurer argues, Hearing Officer Pickens erroneously credited Mr. Mosco's assertion that pharmacy charges are taken from its pharmacy formulary. Insurer explains that Provider failed to "submit any excerpts from this purported formulary to support its claim that . . . [Provider's] actual charges were in line with the formulary." Insurer's Br. at 44.

We are unpersuaded by this final argument, as Insurer appears once again to have mistaken the burden of proof in this case to be Provider's, rather than Insurer's own. Insurer's only evidence that it had been improperly billed $3,600.00 for anesthesia was Dr. Weintraub's testimony that charges are not typically assigned to

21

revenue code 370 but are bundled into operating room charges. Crediting Mr. Mosco's testimony that separate charges under revenue code 370 were appropriate in some instances, Hearing Officer Pickens found no basis to conclude that anesthesia charges were improperly unbundled. FRHO Decision, F.F. No. 35(l). Thus, we agree with Hearing Officer Pickens that Insurer failed to prove that the $3,600.00 for anesthesia services was anything other than the usual and customary charge for such services.

## V. Conclusion

Insurer lacks standing to challenge the constitutionality of Section 306(f.1)(10) of the Act, 77 P.S. § 531(10), as it has failed to establish how it has suffered actual prejudice or harm as a result of that provision or related provisions. All of Insurer's remaining arguments depend on a challenge of Hearing Officer Pickens' evidentiary determinations. It is well settled, however, that "the hearing officer is the fact[]finder, and that we will not reweigh the evidence or substitute our own credibility determinations for those of the hearing officer absent an abuse of discretion." *Jaeger v. Workers' Comp. Fee Rev. Hearing Off. (Am. Cas. of Reading)*, 24 A.3d 1097, 1101 (Pa. Cmwlth. 2011). Because Hearing Officer Pickens' factual findings have adequate support in the record, there is no basis for disturbing them. Accordingly, we affirm her order.

MATTHEW S. WOLF, Judge

Judge Fizzano Cannon Concurs in Result Only

22

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| American Select Insurance Company, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1366 C.D. 2024 |
| | : | |
| York Hospital c/o Wellspan Health | : | |
| (Bureau of Workers' Compensation | : | |
| Fee Review Hearing Office), | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 27th day of March 2026, the order of the Bureau of Workers' Compensation Fee Review Hearing Office in the above-captioned matter, dated September 19, 2024, is hereby AFFIRMED.

_____

MATTHEW S. WOLF, Judge